**Isaac ROBERTS, Petitioner,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, Respondent.**

**Civ. A. No. 64–G–67.**

United States District Court
S. D. Texas,
Galveston Division.

Sept. 15, 1965.

Charles M. Coussons, Jr., Houston, Tex., for petitioner.

Waggoner Carr, Atty. Gen. of Texas, Charles B. Swanner, Ass't. Atty. Gen. of Texas, Austin, Tex., for respondent.

NOEL, District Judge.

Isaac Roberts, petitioner herein, an inmate of the Clemens Unit of the Texas Prison System in this District and Division, seeks a writ of habeas corpus under 28 U.S.C.A. § 2241.

Petitioner's constitutional attack on his incarceration is three-pronged. He first alleges that, within the meaning of Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), his signed confession was obtained in violation of due process of law. His second complaint is that he was furnished neither counsel nor investigative facilities for 25 months after having been arrested for a felony punishable by death. His third complaint is that he was placed in double jeopardy because actually tried before a juvenile judge, convicted, and incarcerated two years earlier for the same murder.

A hearing was held on April 22, 1965, at which time petitioner was given full opportunity to present evidence in support of his factual allegations. Petitioner took the witness stand at the evidentiary hearing but did not so at his trial in the state court. He appeared to be intelligent, well nourished, but very nervous. Having observed petitioner's demeanor while on the witness stand and having given careful consideration to all of his testimony, his personal interest in the outcome of his application, his testimony on cross-examination, to the affidavits of other witnesses, and the entire record made at the evidentiary hearing, I reject the testimony of petitioner and

find it to be untrue where in conflict with the affidavit of Earl King. I accept the statement of Earl King as being the accurate version of what occurred.

On May 15, 1946 Isaac Roberts was paroled from the State School for Boys at Gatesville, Texas, to his uncle, Marvin Pitts.[1] Marvin Pitts owned a 268-acre dairy farm located in Johnson County, Texas, on which he supported himself and his family by milking about forty cows. Isaac Roberts was the child of his wife's brother. Although the Pittses had three grown children of their own, two sons and a daughter, only Isaac Roberts was living on the place with them for the month immediately preceding and at the time Pitts was killed. There was no school during this month that Roberts spent with his uncle and aunt. His only steady duty consisted of helping his uncle with the evening milking. Nothing had occurred during this month to give anyone remote reason to suspect that Roberts harbored any feelings of ill will toward his uncle.

June 16, 1946 being Father's Day, the Pitts' daughter, Mrs. Naomi Sue Blevins, then working in Fort Worth, Texas, came home to spend that day with her father and mother. Roberts rode with his uncle and aunt to the bus station at Joshua, Texas, to meet her that morning, and the four then drove back to the farm together. At about seven-thirty that evening the time came for the Pittses to drive their daughter back to the bus station. Roberts declined his aunt's invitation to go along but handed ten cents to Mr. Pitts and asked that he bring him back a couple of pieces of a certain kind of candy.

Mr. Pitts was unable to locate this candy in Joshua on that Sunday night. Upon his return hime that night, Mr. Pitts was shot by Isaac Roberts. According to Roberts' statement, the shooting occurred as follows:

"I gave him a dime and told him to get me two pieces of candy and when he came back in that night, he hallowed (sic) into my room and told me he could not get me the candy because the stores had already closed. About that time I stepped to the door leading from my bedroom into the kitchen and Marvin Pitts was standing over at the sink with his back turned to me and I spoke to him and just as he was turning around, I begun to shoot him with my 22 target pump gun. Mr. Pitts started turning to his left when I started firing and I shot him four times and I believe all of the four bullets hit him."

This record is barren of evidence that Roberts had any history of violence and contains no facts which might seriously indicate the shooting to be the product of a sudden rage. The fact that he was disappointed because his uncle had not brought back the candy has never been pursued as a mitigating circumstance, even by his defense at the state trial. The sole conclusion to be drawn from this record is that Roberts, for reasons that must have gone deeper than any frustration he could have felt over not receiving the candy, had decided to kill his uncle and that it was murder as found by the jury.

Later on that evening Earl King, then a deputy sheriff of Johnson County, re-

1. According to the juvenile records of Johnson County, Texas, Roberts' record prior to the murder of Marvin Pitts is as follows:

"2–19–44 Isaac Roberts adjudged Juvenile Delinquent Sentenced to Gatesville State School for Boys—paroled to parents during good behavior.

"9–27–44 Isaac Roberts was again brought before Court charged with cases of theft and bur-

glary and again committed to Gatesville State School for Boys but placed in the custody of Dr. Reeves until suitable place is found for him.

"10–10–44 Again arrested for burglary, parole is revoked and he is committed to Gatesville State School for boys.

"10–10–46 Paroled to Marvin Pitts, subject to good behavior. PJJ"

ceived word of the shooting. He drove to the Pitts farm and upon arrival there was advised that Roberts had fled in the family pickup truck. A search was instituted for Roberts and the truck. King was notified shortly after midnight that Roberts had been apprehended and placed in custody at Waco, Texas, whereupon he proceeded to Waco, took Roberts from the custody of the Texas Department of Public Safety at the Station at Waco, and immediately left Waco for Cleburne by automobile. Cleburne was and is located 72 miles from Waco, by good paved highway.

Almost immediately after leaving Waco, in response to King's questions Roberts gave a full and detailed oral confession to the murder of his uncle, Mr. Pitts. I find this confession to have been motivated by a feeling of remorse. I find that no coercion in any form was exercised by King on Roberts. I find that King and Roberts were the sole occupants of the car.[2]

King and Roberts arrived at the Cleburne jail before dawn, where Roberts was immediately confined. During the morning a group of newspaper reporters were allowed to talk to Roberts. At midday Roberts was taken before the County Attorney to sign a formal statement drawn *in the language of his oral confession* previously given deputy King. Before signing, Roberts was warned that he need make no statement but that any statement made could be used in evidence against him. He made no request to see his own immediate family or for assistance of counsel.

Roberts was confined in the Cleburne, Texas, jail until June 24, 1946, at which time his parole was revoked and he was recommitted to the State School at Gatesville. Admitted into evidence at the hearing before this Court was an affidavit from Roberts' parents to the effect that they visited the jail every day during the week of June 17–24, 1946, but were not allowed to see their son. I find in ac-

cord with the clear implication to be drawn from the affidavit of Earl King that had Roberts requested or expressed a willingness to see either his parents, an attorney or an adult friend during his eight-day confinement in the Cleburne jail, such would have been made possible. It was established at the evidentiary hearing that Roberts' relations with his parents during this period of time were far from satisfactory, and I find that Isaac was unwilling to see either of his parents during his week of confinement in the Cleburne jail.

The petition filed June 17, 1946 to revoke Roberts' parole contains the allegation that Roberts had become a delinquent child under the law and cites the murder of Marvin Pitts as evidence of this delinquency. The Court's order of June 24, 1946, however, merely states the reason for the revocation as being that Marvin Pitts, in whose custody Roberts had been paroled, was now deceased.

Roberts was indicted for the murder of Marvin Pitts on July 7, 1948. He was represented by counsel at his subsequent trial at which he was convicted and sentenced to serve a 55-year term in the State Penitentiary.

■ In reference to the first alleged ground for relief, petitioner draws a distinction between a confession tainted because involuntary and one secured in violation of due process of law. As Roberts in his petition to this Court had characterized the confession as "coerced," I strongly suggested at the April hearing the possibility of a Jackson v. Denno, 371 U.S. 967, 83 S.Ct. 553, 9 L.Ed.2d 538 (1964), question and gave petitioner additional time after the hearing in which to decide if he wished to pursue any remedy which he might have under this decision. Petitioner has elected not to follow this course and states clearly in his brief that he does not claim the confession to be involuntary but rather is contending that within the meaning of

2. Roberts testified at the evidentiary hearing that another deputy sheriff was present in the car during the trip back to Cleburne. Earl King testified in his affidavit, however, that only he and Roberts were present in the car.

Gallegos v. State of Colorado, 370 U.S. 49, 82 S.Ct. 1209, 8 L.Ed.2d 325 (1962), it was secured in violation of due process of law.

The defendant in Gallegos, a fourteen-year-old boy, made oral confession as soon as he was arrested. After having been detained by the police under conditions of "security" for five days during which time he saw no lawyer, parent, or other friendly adult, he signed the formal confession which was introduced in evidence at his trial in Colorado state court. His conviction was reversed on certiorari by the United States Supreme Court which found that under these conditions the confession was obtained in violation of due process. I find the facts with which the Supreme Court was confronted in Gallegos to be materially different from those now before this Court. Gallegos admitted his guilt upon three occasions; immediately upon his arrest on January 1, 1959; after examination by police in juvenile hall, January 2; and by the signing of the formal confession on January 7, which was the only one found by the Court to be in violation of due process.

The basis for the majority decision was the "ominous cast" which it found to be placed upon the case by the five-day period of detention during which the boy was cut off from the outside world. By comparison, Roberts was interviewed by newsmen before he signed his formal confession, which signing occurred within a matter of hours from the time of his arrest. As noted in the dissenting opinion of Justice Clark, however, the majority in Gallegos, while not squarely holding the two earlier confessions of Gallegos to be in violation of due process, cast by innuendo its view that they were obtained "in callous disregard of this boy's constitutional rights," because the defendant there being only fourteen years of age, "would have no way of knowing what the consequences of his confession were without advice as to his rights * * * and without the aid of more mature judgment as to the steps he should

take in the predicament in which he found himself."

The Court of Appeals for the Third Circuit in United States ex rel. Smith v. State of New Jersey, 323 F.2d 146 (1963), after full consideration of Gallegos found the confessions of two seventeen-year-old defendants not in violation of constitutional standards. Considered decisive by that Court was the fact that the past record of these two seventeen-year-olds indicated them to be sophisticated and experienced in their dealings with police officers. Because of Roberts' several prior arrests and contacts with the juvenile authorities,[3] I find that despite his age, he was knowledgeable, experienced and sophisticated in dealing with the type situation in which he found himself at the time he confessed orally as well as during the time of his detention and the signing of his written confession. Accordingly, I further find that his power to resist any pressures which may have resulted from his confinement or from contact with the authorities was more akin to the two seventeen-year-old boys who were under consideration by the Court of Appeals for the Third Circuit than to the unsophisticated Gallegos. I find that Gallegos is factually distinguished from the instant case and therefore Gallegos is not controlling authority for the decision of the instant case. I find petitioner's confession not to have been obtained in violation of due process under the totality-of-circumstances doctrine enunciated in Gallegos.

Petitioner's second complaint that he was furnished neither counsel nor investigative facilities for twenty-five months subsequent to his arrest on a charge punishable by death centers upon the most sensitive area in the present development of the law on right to counsel. This being the question of whether after, within the meaning of Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), the right to counsel has attached, this right depends upon a request. The Court of Appeals

---

3. See Roberts' juvenile record, f.n. 1.

for the Fifth Circuit has recently had occasion to consider this question in the case of Collins v. Beto, 348 F.2d 823 (June 18, 1965). In order to delineate what the Court held, as contrasted with the individual views of the Judges as expressed in their separate opinions, it will be necessary to refer to these writings by name. The author of the majority opinion, Chief Judge Tuttle, expressed the opinion that the omission to request counsel under these conditions must be viewed as inconsequential. Judge Hutcheson, endorsing the opinion of the District Court, dissented. Judge Friendly, in a concurring opinion, approved the reversal of the District Court on other grounds, but with reference to Escobedo, explicitly stated:

"Since the expansive reading of Escobedo sometimes proposed would take the Court rather far from the historic purpose of the Sixth Amendment, as explained in Powell v. State of Alabama, 287 U.S. 45, 60–65, 68–73, 53 S.Ct. 55, 77 L.Ed. 158 (1932), and Bute v. People of State of Illinois, 333 U.S. 640, 660–663, 68 S.Ct. 763, 92 L.Ed. 986 (1948), and would invalidate numerous state and federal convictions if retroactively applied, and might drastically affect the necessary investigation of crime, I do not wish to essay resolution of these grave problems * * * when, in my view, the relator is entitled to prevail on another ground."

It therefore becomes essential to make clear that this Court construes Collins to bind only upon those points agreed upon by the majority of the Court, as carefully articulated in the concurring opinion of Judge Friendly, among which, of course, is not included this facet of the right-to-counsel question. While well aware of the reasoning underlying the liberal result achieved in People v. Dorado, 42 Cal.Rptr. 169, 398 P.2d 361 (1965), 1 am of the opinion that the impact of this decision should be limited to its particular facts, which differ from those now before this Court.

The Supreme Court of Illinois speaking in People v. Hartgraves, 31 Ill.2d 375, 202 N.E.2d 33 (1964), refused to extend Escobedo to bar a voluntary confession because the accused had not been advised of his right to counsel prior to his admission of guilt. Here also, no request for counsel had been made. In speaking of Dorado, the Supreme Court of Illinois said:

"In the Dorado case a divided California court, also relying on Escobedo, struck down a confession because the accused had neither affirmatively waived his right to counsel nor had been affirmatively advised of such right. In the Dorado case it should also be noted that the accused was interrogated while an inmate of the penitentiary and under prison discipline."

Roberts' statement, of course, was not given under these conditions. The Court of Appeals for the Seventh Circuit, United States ex rel. Townsend v. Ogilvie, 334 F.2d 837 (1964), and the Court of Appeals for the District of Columbia Circuit, Cephus v. United States, 352 F.2d 663 (June 21, 1965), have found Escobedo to be applicable *only when the accused has requested assistance of counsel.* The following language is found in Cephus v. United States, supra:

"The Escobedo holding must be read in light of its facts and especially of the purposeful exclusion of Appellant's waiting lawyer from an opportunity to counsel his client while police pursued their interrogation. There, as in Massiah [Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246] affirmative police action existed preventing counsel and advice after the time when, as the Supreme Court decided on the facts in those cases, the right to consult with counsel had attached."

The Supreme Court of Pennsylvania reasoned in Commonwealth v. Senk, 212 A.2d 222 (July 20, 1965), that while in Escobedo the emphasis was placed on the right to counsel, basically the decision concerned the right against self-incrimination. "The main purpose and true sig-

nificance of the decision is to guarantee to an accused, during a police investigation, full protection of his right not to convict himself out of his own mouth." The Pennsylvania Court found this right to be adequately protected when the accused was warned of and clearly understood his right to remain silent and that the reason underlying Escobedo was that assistance of counsel was found essential there to insure that the understanding of this right was conveyed to Danny Escobedo. The understanding of his right to remain silent was clearly imparted to Roberts, however, before he signed his confession, as prior to its signing he was warned that he need make no statement but that anything that he did choose to say could be used in evidence against him. In view of the fact that Roberts had full understanding of his right to remain silent and had made no mention of any desire for assistance of counsel before signing the statement, I am of the opinion that Escobedo is inapposite to these facts.

No allegation is made that counsel was not timely appointed when criminal proceedings were instigated or that petitioner was not effectively represented by counsel at trial. There is no constitutional guarantee that "investigative facilities" be furnished apart from the effort of competent counsel. I conclude, then, that petitioner's Sixth Amendment rights as made obligatory upon the States by the Fourteenth Amendment have not been violated in any respect.

The third and final prong of petitioner's constitutional attack is that he was twice placed in jeopardy as prohibited by the Fifth Amendment. However, the Fifth Amendment becomes applicable to the States through the Fourteenth Amendment *only* if the kind of jeopardy found to be involved subjects a defendant to a hardship so acute as to violate our concept of ordered liberty. Palko v. State of Connecticut, 302 U.S. 319 at 326–328, 58 S.Ct. 149, 82 L.Ed. 288 (1937). I see no semblance of this concept in what happened to Roberts. Juvenile proceedings in Texas are civil rather than criminal proceedings. Hultin v. State, 171 Tex.Cr.R. 425, 351 S.W.2d 248 (1961). Roberts was indicted and tried but the one time in 1948 for the offense of murder. The fact that this indictment arose from the same series of events as had his earlier recommitment to the juvenile home is not sufficient alone to constitute jeopardy as applied to the States under the Fourteenth Amendment. Hoag v. State of New Jersey, 356 U.S. 464, 78 S.Ct. 829, 2 L.Ed.2d 913 (1958). Petitioner has therefore failed on each of his three counts to substantiate his complaint that his incarceration is in violation of federally protected rights.

The petition is therefore dismissed.