James F. **HEGWOOD**

v.

M. B. **KINDRICK**, General Superintendent, Gatesville School for Boys.

Civ. A. No. 66–H–887.

United States District Court
S. D. Texas.
Houston Division.

Feb. 27, 1967.

Otto Yelton, Jr., Houston, Tex., for petitioner.

Crawford Martin, Atty. Gen. of Texas, Larry Craddock, Asst. Atty. Gen. of Texas, Austin, Tex., for respondent.

SINGLETON, District Judge.

*Memorandum and Order*

Petitioner, James F. Hegwood, as next friend of his minor son, Gerald Wayne Hegwood, filed a petition for habeas corpus challenging the legality of said minor's confinement in the Gatesville School for Boys. By virtue of a judgment of the Juvenile Court of Brazoria County, dated September 13, 1965, in Cause No. 325, said minor was adjudged a delinquent child and placed on parole. On October 4, 1966, by order of the same court, the parole was revoked and the minor was transferred to the custody of the respondent at Gatesville School for Boys, where he is presently confined.

Petitioner alleges that the initial adjudication of delinquency was secured by procedures which violated the 5th, 6th, and 14th Amendments to the United States Constitution.

■ Respondent's answer stipulated the exhaustion of State remedies.[1] This Court has jurisdiction under 28 U.S.C.A. § 2241.

For the reasons set out hereinafter, the Court has determined that the initial adjudication of delinquency was secured under circumstances so inherently violative of the Constitution as to require a new hearing in the State juvenile court.

An evidentiary hearing held on January 7, 1967, revealed four significant fact situations which will be discussed in order: (1) The investigation conducted by William McCall, Juvenile Officer of Brazoria County, Texas, and Chief Casey of the Pearland, Texas Police Department, which led to the filing of charges against Gerald Wayne; (2) the meeting between Mr. Hegwood and Mr. McCall on the morning of September 11, 1965; (3) the interview in Mr. McCall's office on September 13, 1965; and (4) the events which transpired during the hearing of Cause No. 325 on September 13, 1965.

1. During and preceding the summer of 1965, Gerald Wayne had been the subject of several complaints to the Pearland Police Department. On August 22, 1965, a telephone informant accused Gerald Wayne of stealing a bicycle. Acting on this information, Chief Casey called Mr. McCall, who has been Brazoria County Juvenile Officer since 1959, to assist in investigating the complaint.

---

1. See page 1 of Respondent's ᐟAnswer. Petitioner's writ of habeas corpus to the Supreme Court of Texas was filed and denied on December 9, 1966, under Cause No. A–11,805.

When Mr. McCall arrived at the police station, he found Gerald Wayne, then 15 years old, already in custody. From there Chief Casey, Mr. McCall, Officer Phillips, and Gerald Wayne drove out together in a police car to the Hegwood home, located about 10 miles outside of Pearland. Here, Gerald Wayne led the group to an out building where they found a partially dismantled bicycle. Mr. McCall testified that the serial number on the bicycle matched the one on a sales receipt given to him by Chief Casey. The officers removed the bike from the Hegwood premises; its whereabouts is now unknown.

The above transactions were carried out without the aid of any warrants, search or arrest, and without any warnings having been given to Gerald Wayne. Nor does it appear that Gerald Wayne's parents were contacted before the party arrived at the Hegwood home.

Gerald Wayne has steadfastly maintained that he was lawfully in possession of the bicycle as a result of a trade. Mr. Hegwood testified that the bike was partially disassembled because he was repairing it for Gerald Wayne. Nevertheless, Mr. McCall testified that no further investigation of the alleged bicycle theft has ever been conducted.

The bicycle incident is significant because it apparently precipitated the submission by Chief Casey to Mr. McCall of a "police offense report." Although this report was not introduced at the habeas corpus hearing, excerpts from it appear in Mr. McCall's summary of Gerald Wayne's case, dated September 7, 1965. (Petitioner's Exhibit No. 10) Enumerated in this report are various instances of antisocial conduct allegedly attributable to Gerald Wayne, including the theft of a shotgun, a rifle, rings, and money, and the killing of a dog. Mr. McCall's summary of these incidents concludes as follows:

"This worker has never had any past dealings with this boy, although the Police Department in Pearland inform me that they had several referrals, but they have never, until this time,

been able to prove this boy was involved in any situation." (Page 2 of petitioner's Exhibit No. 10)

On the same day, September 7, 1965, or the following day, Mr. McCall's summary and the police offense report were forwarded to the Brazoria County District Attorney, together with Mr. McCall's recommendation that a delinquency petition be filed. On Thursday, September 9, 1965, such a petition was prepared and filed. Service was made on Mrs. Hegwood, Gerald Wayne's mother, the following day, Friday, September 10. (Petitioner's Exhibit No. 11) Mr. Hegwood did not see the complaint until he returned from work that evening.

The petition alleged:

"William McCall, a competent and credible person, * * * filed a petition in this court alleging that Gerald Wayne Hegwood * * * is a delinquent child under the law. He has violated a penal law of this State of the grade of felony, to wit, the crime of theft of personal property of over the value of $50.00." (Petitioner's Exhibit No. 11)

The hearing was set for Monday, September 13, 1965.

The events set out above leading up to the filing of the delinquency petition have been detailed in order to emphasize this Court's firm conviction that the petition was filed before an adequate investigation had been conducted. Aside from the bicycle incident, nothing approaching hard evidence was even alleged at the hearing to have been obtained against this boy. Mr. McCall's report (Petitioner's Exhibit No. 10) is replete with hearsay, innuendo, guilt by association, everything but hard evidence. It is difficult for this Court to conceive of depriving any person, regardless of age, of his liberty on this type of evidence without a thorough hearing.

Shocking though the dearth of evidence may be, retrial of Gerald Wayne might not have been necessary had there been any attempt in the subsequent pro-

ceedings to ameliorate these deficiencies. There was none.

2. Fixing the time of the first meeting between Mr. Hegwood and Mr. McCall becomes important in view of the assurances Mr. Hegwood alleges were given to him by Mr. McCall.

Mr. McCall testified that he did not recall meeting petitioner at any time before September 13, 1965. On the other hand, petitioner testified that he first met Mr. McCall at a Pearland cafe on Saturday, September 11, the morning after service of the petition. Mr. Hegwood had entered the cafe in hopes of finding Chief Casey to inquire of him what should be done about the petition. There he found Chief Casey seated at the table drinking coffee with a man who was introduced as Mr. McCall, the County Juvenile Officer. A conversation ensued, during which Mr. Hegwood testified that Mr. McCall assured him that "everything would be all right," and suggested ·that the Hegwoods appear in his office at 10:00 o'clock, Monday morning, September 13th, shortly before the hearing was set. The fact that Mr. Hegwood made no further attempts to secure information regarding his son's status, together with the fact that Mr. and Mrs. Hegwood and Gerald Wayne did appear for a pre-trial conference at 10:00 o'clock the following Monday, leads this Court to the conclusion that the meeting in the cafe did occur and that the assurances were given.

Though the surroundings were informal, this was undoubtedly a crucial stage in the proceedings against Gerald Wayne. A few hours after seeing the delinquency petition, Mr. Hegwood confronted face-to-face the Chief of Police and the County Juvenile Officer and asked them what to do. These men well knew the seriousness of adjudication of delinquency. And yet the conclusion is inescapable that they did not communicate this knowledge to Mr. Hegwood. It would have been a simple matter to tell Mr. Hegwood to consult a lawyer or to bring a lawyer with him to the pretrial conference the following Monday. But this was not done. Instead, he was made to feel secure in the knowledge that Mr. McCall, the complainant, would look out for Gerald Wayne's interest. Having received these assurances, Mr. Hegwood returned home to await the Monday conference and hearing.

3. Following the instructions given Saturday, the Hegwoods appeared in Mr. McCall's office at 10:00 o'clock, Monday, September 13, 1965. The transactions at this conference are essentially undisputed.

Mr. McCall testified that it was his established practice to interrogate the minor outside of the presence of the parents in order to obtain the boy's side of the story before the hearing. As a rule, a secretary takes down and transcribes excerpts from the interrogation. The notes of Gerald Wayne's interrogation have been introduced as Petitioner's Exhibit No. 9.

Mr. McCall does not consider this procedure to be a criminal-type-in-custody interrogation. Thus, he does not give the standard constitutional warnings, except in the rare, "serious" cases. Apparently, Mr. McCall did not consider Gerald Wayne's case "serious," for no warnings were given.

Mr. McCall proceeded to interrogate Gerald Wayne with reference to each of the items set out in the "police offense report." Gerald Wayne refused to admit his guilt on any of these accusations, including theft of the bicycle. Finally, after some half an hour or so of questioning, Gerald Wayne did admit "taking" a single action shotgun, the value of which has never been ascertained. The parents were then called into the office. During the private interrogation of Gerald Wayne, and later during the conversation with his parents, there can be no doubt that Mr. McCall finally pointed out to all parties that the boy could be in serious trouble as a result of the hearing which was set for that afternoon. However, this admonition was counteracted by repeated assurances, express and tacit, that Mr. McCall was their friend, that he could exercise some

degree of control over Gerald Wayne's fate, and that, if they would cooperate by securing the services of a family counselor, he would do his best to see that Gerald Wayne was treated leniently.

The following statements by Mr. McCall in petitioner's Exhibit No. 9 are illustrative of this approach:

"You see, I am on your side, right? In the court hearing I am going to tell the judge only that which I have absolute knowledge of * * *

"I am going to do this * * * I am going to tell the court my honest feeling and thinking and of course, it is up to the judge to do what he feels best, but I am going to recommend to the court. I have to do this by law, to declare you a delinquent child, maybe, and to commit you to the state school and parole you * * * or put you on probation to your parents if the court accepts my recommendation, you will be on probation and that means you will have to obey momma and dad; that is the court orders, and you will have to attend Sunday School and church * * *

"I am going to be real honest, now. My only interest is your son, but to help your son, I am going to have to have your help, both Mom's and Dad's."

At some time during this conversation, Mr. Hegwood asked if he could help his son's situation by securing the services of an attorney. Although Mr. McCall clearly did not prevent the Hegwoods from getting a lawyer, it appears that he told them such action would be unnecessary because, he, McCall, would look after the boy's interest. The judgment recites that Mr. McCall did in fact represent Gerald Wayne:

"And came the said Gerald Wayne Hegwood, in person, and with William McCall, a juvenile officer, to represent him in this cause, and announced ready for trial * * *" (Petitioner's Exhibit No. 2)

At the close of this conference the Hegwoods and Mr. McCall went to lunch together.

■ 4. Shortly before the hearing began, Mr. McCall approached the judge and stated that Mr. Hegwood had inquired whether or not it would be advisable for him to secure an attorney. The judge answered that he certainly would not deny petitioner's right to counsel, but that counsel in a case of this nature would probably be of little or no assistance since the judge was just going to apply the law anyway. The hearing then proceeded.[2]

Since the juvenile hearings in Brazoria County are not, as a rule, transcribed, exactly what took place at the hearing of Cause No. 325 on September 13, 1965, will never be known. The evidence presented to this Court indicates that the hearing lasted no longer than five min-

2. Respondent has strongly urged that failure to request counsel at this point amounted to waiver of any such right. This contention is without merit. Even if the right to counsel had been, which it was not, effectively explained to petitioner or Gerald Wayne, there still could be no waiver under the test established by Carnley v. Cochran, 369 U.S. 506, 516, 82 S.Ct. 884, 890, 8 L.Ed.2d 70 (1962): "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation in evidence which show that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver."
Unquestionably, counsel could have performed a significant function in the ju-

venile court proceedings. He could have pointed out to the court the many defects in the prior proceeding, including the lack of evidence and the manner in which Gerald Wayne had been detained and interrogated. In addition, counsel might have urged change of venue under Section 6 of Article 2338–1, or requested a trial by jury as provided by Section 13 of Article 2338–1, Vernon's Annotated Civil Statutes. Moreover, counsel could have exercised the right to appeal provided by Section 21 of Article 2338–1 and could have explained and interpreted to the Hegwoods the terms of Gerald Wayne's parole.

utes. No witnesses, other than Mr. McCall, testified; none of the complaining witnesses were present, or even identified; none of the allegedly stolen items were produced in Court. The judge read Mr. McCall's report and signed the judgment. That was the "hearing."

Gerald Wayne was thus officially adjudged to be a delinquent child and placed on parole. Notwithstanding the niceties of judicial formality, this Court is persuaded that in actuality, Gerald Wayne's delinquency was determined by his neighbors, his teachers, the police, and the county juvenile officer long before the judgment was signed. The neighbors complained about the boy to the police. The police collected these complaints in an offense report without conducting any investigation whatsoever. In turn, the police report was forwarded to the juvenile officer, who accepted it at face value and forwarded it to the District Attorney with directions to file charges. Only after this administrative determination of guilt had been completed, on the very day of the hearing, did anyone bother to ask Gerald Wayne his side of the story.

The hearing, instead of providing an independent and impartial fact finding, became nothing more than another step down the predetermined path to guilt. The judge's comment that an attorney would be of little assistance because the judge merely applied the law anyway can only mean that the facts had already been determined. How could it be otherwise when the county juvenile officer

acted as both complaining witness and as defender at the hearing?

At the heart of this case is the question of which, if any, of the Federal constitutional guaranties should be applied to juvenile cases. There are two constitutional avenues through which an answer may be sought: by way of the Bill of Rights, particularly the 5th and 6th Amendments to the Constitution, or by way of the 14th Amendment.

Attempts to apply the Bill of Rights to juvenile court proceedings have produced conflicting results, which may be summarized briefly. Cases which deny Bill of Rights guaranties to juvenile offenders are usually premised on the legalistic distinction between "civil" and "criminal" cases. This is the majority rule to which Texas adheres. See Pee v. United States, 107 U.S.App.D.C. 47, 274 F.2d 556 (C.A.D.C.Cir.1959) for exhaustive annotation; Ex Parte Martinez, 386 S.W.2d 280 (Tex.Crim.App. 1965); State v. Thomasson, 154 Tex. 151, 275 S.W.2d 463 (1955); Roberts v. Beto, 245 F.Supp. 235, 241 (S.D.Tex. 1965). At the policy level, this result is justified in terms of the doctrine of parens patriae.[3]

In contrast, other cases, also working within the Bill of Rights framework, have concluded that some, if not all, of the Bill of Rights criminal guaranties must be made available in juvenile court proceedings. Advocates of this view sweep aside technical distinctions between civil and criminal cases when the juvenile has been charged with an offense which, if committed by an adult,

---

3. The theory of parens patriae is summarized in Pee v. United States, supra: "[f]rom the earliest times children of certain ages have been deemed by our law to be incapable of crime. And in recent times children of certain ages have been removed from the normal treatments provided for crimes and criminals. This has been in part because of a doubt as to the capacity of children to entertain the vicious will which is an essential element of crime in our jurisprudence, but in much greater part because of a belief that the interests of society are best served by a solicitous care and

training of those children shown by circumstances to be in need of such care and training. These concepts in respect to children have evolved into elaborate systems of procedure. In the event a child commits an offense against the law, the state assumes a position as parens patriae and cares for the child." Also see The Juvenile Court: Effective Justice of Benevolent Despotism, 53 ABAJ 31 (Jan. 1967); and Juvenile Delinquents: The Police, State, Courts, and Individualized Justice, 79 Harv.L.Rev. 775 (1966).

would render him liable to criminal prosecution. See: In Re Poff, 135 F.Supp. 224 (D.C.D.C.1955), right to counsel; Ex Parte Sawyer v. Hauck, 245 F.Supp. 55 (W.D.Tex.1965), double jeopardy; Trimble v. Stone, 187 F.Supp. 483 (D.C.D.C. 1960), right to bail; United States v. Dickerson, 168 F.Supp. 899 (D.C.D.C. 1958), double jeopardy.

Advocates of this approach have been impressed by the growing discrepancy between the theory of parens patriae and its actual practice in the juvenile courts. This concern has recently found expression in the opinion of Justice Fortas in Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (March, 1966):[4]

"There is evidence, in fact, that there may be grounds for concern that the child receives the worst of both worlds: he gets neither the protection accorded to adults nor the solicitous care and regenerative treatment postulated for children." (At p. 556 of 383 U.S., at p. 1054 of 86 S.Ct., p. 94 of 16 L.Ed.2d)

The facts of the particular case now before the Court do not present an appropriate opportunity to enter this civil-criminal dispute. This is particularly true in view of the fact that In Re Gault, 385 U.S. 965, 87 S.Ct. 498, 17 L.Ed.2d 431 (argued December 6, 1966), may well establish guide lines for the application of constitutional guaranties to state court juvenile proceedings.[5]

■■ Instead, this Court has found guidance for decision in the broad principles of due process of law under the 14th Amendment. The crucial, indisputable fact of this case is that Gerald Wayne has been deprived of his liberty as a result of state judicial proceedings. It is also undisputed that any proceedings by which a United States citizen, regardless of age, is deprived of his liberty must be conducted in accordance with due process of law. 16A C.J.S. Constitutional Law § 574. This is true regardless of whether the proceedings are characterized as civil or criminal and irrespective of any additional rights derived from other sections of the Constitution. Thus, at a bare minimum, Gerald Wayne was entitled to state judicial proceedings which met the test of due process under the 14th Amendment. Kent v. United States, supra, 383 U.S. page 598, 86 S.Ct. 1045.

■ In order to determine whether a particular individual has been deprived of his liberty without due process of law, the Court must measure the procedures in each case against our traditional notions of fundamental fairness and fair play as enunciated by Mr. Justice Cardozo in Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), and Palko v. State of Connecticut, 302 U.S. 319, 58 S.Ct. 149, 82 L.Ed. 288 (1937), and as reiterated by Justice Frankfurter in Rochin v. People of State of California, 342 U.S. 165, 169, 72 S.Ct. 205, 96 L.Ed. 183. The test must be applied to the facts of each individual case. Pee v. United States, supra, 274 F.2d page 563.

■ In applying these principles to the facts as the Court has found them in this case, the result becomes clear: Gerald Wayne's case must be retried by the state juvenile court because the entire proceedings against him, from beginning to end, whether they be characterized as civil or criminal, have violated our traditional notions of substantial justice and fair play. This opinion should not be construed as holding that the doctrine of parens patriae is incompatible with due process or that all of the Federal criminal guaranties must be made available to juveniles. In this Court's opinion it is quite possible that due process in juvenile courts, within the framework of the doctrine of parens

---

4. This case arose under the District of Columbia Juvenile Act and primarily discusses constitutional issues raised by the juvenile court's improper waiver of its exclusive jurisdiction over a juvenile.

5. The question before the Court in Gault is: "Does Arizona Juvenile Code deprive a child of due process, in violation of the 14th Amendment?" 35 L.Week 3012.

patriae, may not include all of the constitutional guaranties now imposed on criminal prosecutions. This was recognized in Kent v. United States, supra:

"We do not mean by this to indicate that the [re]hearing to be held must conform with all of the requirements of a criminal trial or even of the usual administrative hearings; but we do hold that the hearing must measure up to the essentials of due process and fair treatment." (At p. 562 of 383 U. S., at p. 1057 of 86 S.Ct., at p. 97– 98 of 16 L.Ed.2d)

As a guide to the state in retrying Gerald Wayne, if it chooses to do so, the Court would suggest that affording Gerald Wayne a full opportunity to be represented by counsel in a hearing which is transcribed by a court reporter would more nearly bring Gerald Wayne's case within the ambit of this Court's notion of "due process and fair treatment."

The petition for habeas corpus will be granted, and the State will have thirty days after the entry of judgment in which to retry or release Gerald Wayne Hegwood.

Counsel will promptly draft and submit an appropriate judgment.