[Crim. No. 10061. In Bank. Sept. 29, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. TONY MON-
TOYA LARA and RAYMOND MORALES ALVAREZ,
Defendants and Appellants.

Everett E. Ricks, Jr., and J. Raymond Cullum, under appointment by the Supreme Court, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, James H. Kline and Thomas Kerrigan, Deputy Attorneys General, for Plaintiff and Respondent.

MOSK, J.—Defendants Lara and Alvarez appeal from judgments convicting each on one count of first degree murder and one count of kidnaping for the purpose of robbery with the victim suffering bodily harm. (Pen. Code, §§ 189, 209.) Alvarez was sentenced to life imprisonment on both counts; pursuant to jury verdicts, Lara was sentenced to death on the murder count and life imprisonment without possibility of parole on the kidnaping count. The appeal of Lara is automatic. (Pen. Code, § 1239, subd. (b).)

Defendants' principal contentions are that incriminating evidence was introduced against them which had allegedly been obtained by an illegal search and seizure, that they did not intelligently and understandingly waive their rights under *People* v. *Dorado* (1965) 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361], that it was a violation of *People* v. *Aranda* (1965) 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265], to allow their mutually incriminating confessions into evidence, and that the prosecutor committed prejudicial misconduct. As will appear, we have concluded that no prejudicial error occurred and hence the judgments should be affirmed.

About 3 p.m. on May 23, 1965, the body of Raymond

Mitchell was discovered in a large excavation used as a dump near Wilmington, California. He was lying on a ledge some 15 feet below the top of the excavation. His hands were tied behind his back with strips torn from his T-shirt. He had been shot in the back with a shotgun, death being caused by massive hemorrhages of the vital organs. Officer Taggart of the Los Angeles Police Department, the first to reach the scene, found two spent shotgun shells on the ground nearby. The deputy coroner fixed the time of death at between 3 a.m. and 8 a.m. that same day.

That evening, Mitchell's car, a light-colored 1951 Chevrolet, was found abandoned approximately two miles away in an area known as the Bixby Slough. It was stuck, and could not be moved either forward or backward under its own power. Officer Taggart examined the vehicle and observed a discoloration appearing to be blood on the steering column.

Augustine Meza testified that about 1:30 a.m. on May 23 he was offered a ride by Mitchell in the latter's Chevrolet. They drove to a liquor store to buy some cigars. Meza declined Mitchell's offer of a drink from a bottle of wine, explaining he had been drinking since a wedding reception the previous afternoon. Ten or fifteen minutes later they drove to a lumberyard where they encountered defendants Lara and Alvarez, known to Meza respectively as "Tony" and "Baby." Lara and Alvarez entered Mitchell's car, saying "Why don't you take us for a ride?" Meza then asked to be driven home, and Mitchell complied. It was 2 a.m.; Meza had something to eat, and went to bed.

Roberta Real testified that about 4 a.m. she received a telephone call from Lara, who was her boyfriend. He sounded drunk and sleepy. He told her he had been in a fight and "I shot some boy. me and some other ones," and left him in the dump. The witness could not remember the other details of the conversation, but testified that a certain written statement she gave to the police two days later was true at the time she made it. In the relevant portion of that statement, which was read to the jury, "Tony [Lara] said he had a fight with the guy. They got out of the car and Tony took the gun and told the guy to take off his jacket and shirt. Tony said if you don't take off your jacket by the time I count to five, I will shoot you. The guy was crying and said 'Don't shoot. Don't shoot.' The guy took off his jacket, just leaving his T-shirt on. Then Tony said they tied the guy's hands behind his back, and the guy acted like he fainted or something."

About 3:30 p.m. on the day of the shooting Meza again encountered Alvarez at the lumberyard. Alvarez told Meza that they had killed the boy who had driven Meza home; that "one of them had shot him first and then the other one." Meza expressed disbelief, and left.

Two days later Meza was in the custody of the Pasadena police on an unrelated charge. Meanwhile, friends of Mitchell had informed the authorities they last saw the deceased in the company of a man named Augustus or Agosto. A Pasadena jailer who had heard about the Wilmington murder learned that Meza's first name was Augustine and saw what appeared to be blood on his clothing. He called the matter to his superior's attention, and Meza was interviewed by Officer Taggart and his partner, Sergeant Knapp. Meza related to the officers the above described events of May 23, including the apparent involvement of "Tony" and "Baby" in the murder. The officers learned through the juvenile authorities that the latter were probably Lara and Alvarez, and Meza recognized the names and identified their faces from photographs.

The Los Angeles police thereupon communicated this information to the Police Department of the City of South Gate, where Lara's sister, Mrs. Arujo, lived. Officer Miller of that department went to Mrs. Arujo's house at 6 p.m. the same day. She answered the door, identified herself as Lara's sister, and let the officer into the living room. He asked if Lara was there, and requested permission to search the premises. Permission was denied, but the officer heard a thumping noise from an adjacent bathroom. Lara then appeared from the hallway and said, "Are you looking for me?" After Lara identified himself he was placed under arrest on the charge of murder. The officer then looked in the bathroom and found a 12-gauge shotgun. Officer Miller said to his partner, Sergeant Weiss, "I wonder if this gun is loaded," and Lara interrupted, "The gun is loaded" and volunteered to unload it. The gun was turned over to a ballistics expert, whose tests subsequently established it was the same weapon that had fired the two shells found near Mitchell's body.

Mrs. Arujo testified that in the two-day period between the shooting and Lara's arrest the latter asked her if he could stay at her house. He told her he was "in trouble" because he and others had shot the boy whose body had been found in the dump. After refreshing her recollection from a statement

she had given to the police, the witness testified Lara also told her "they had tied him up" before shooting him.

At the time of Lara's arrest Sergeant Weiss told him it was his duty to advise him of his constitutional rights. Lara replied that he knew his rights; but the officer said it was his duty to advise him anyway, and informed him that he had the right to an attorney, that he could remain silent if he wished, and that any statements he made could be used against him in court. The officer asked Lara if he understood, and he replied that he did.

Lara, Mrs. Arujo, and her two children were transported to the South Gate Police Department and turned over to the investigating officers, Taggart and Knapp. Miss Real, whose mother had reported her to the police as a runaway juvenile, was also taken into custody. Lara was again advised of his constitutional rights, and again stated he knew and understood them. After failing in his efforts to make a "deal" with the officers, as hereinafter described, Lara confessed.

The first part of his statement corroborated the information given by Meza as to what occurred in the early morning hours of May 23. After taking Meza home, according to Lara, Mitchell drove back to the lumberyard with him and "this other person."[1] Lara retrieved a shotgun he had "stashed" there, and upon returning to the car displayed it to Mitchell and asked, "Do you know what this is?" There was a scuffle, then Mitchell began driving at their direction. They stopped at the dump near Wilmington, and Lara ordered Mitchell to take off his coat and shirt. Mitchell refused, and Lara warned that if he did not do it by the count of five he would hit him and the other person would shoot him. Mitchell either fainted or was knocked unconscious. Lara kicked him twice in the head; they removed his coat and shirt, tore off part of his undershirt, and used it to tie his hands behind his back. They first put him in the trunk of the car, but were unable to close the lid. They then carried him to the edge of the excavation and threw him over. Lara obtained the gun from the car, set the choke, and shot Mitchell in the back as he lay on a ledge below. The other person took the gun, reset the choke, and also fired a shot at Mitchell. According to Lara, he and his companion wanted Mitchell's car for the purpose of using it in the commission of an armed robbery, and they killed him to prevent him from identifying them.

---

[1] At the time of giving the statement Lara declined to name the person he was with on the night of the shooting. However, he subsequently identified him to the police.

The two then drove away, looking for a place to rob. Finding none to their liking, Lara took the other person home. Lara then removed some small objects from the car, wiped it clean of fingerprints, and "ditched" it when it stuck in a field.

After making the foregoing oral statement, Lara reduced it to writing and signed it. He subsequently led Officer Taggart to some bushes in a field, where Mitchell's coat and shirt were found hidden, and to a spot in the back yard of his mother's house, where Mitchell's ignition and house keys, and the items taken from his car, were unearthed.

At 10:10 p.m. on May 25 Alvarez was arrested at his home and taken to the San Pedro police station. One of the arresting officers informed him he had the right to an attorney and the right to remain silent, and that anything he said could be used against him in a criminal prosecution. When asked if he understood, he replied that he did. Officers Taggart and Knapp arrived and again advised him of these constitutional rights. Alvarez asked if he could talk to Lara before saying anything, and the two were allowed to confer briefly in private. In the officers' presence Lara said to Alvarez, "I have told them the story. Go ahead and tell them the truth." Alvarez then wrote out and signed a statement substantially similar to that given by Lara, naming both himself and Lara as participants and concluding, "Tony shot him and then I shot him." Finally, the two repeated their story orally for a tape recording.

No affirmative defense was offered.[2]

 Lara first contends that the shotgun found by Officer Miller in the bathroom of Mrs. Arujo's house was obtained by means of an illegal search and seizure. As Officer Miller had neither an arrest nor a search warrant, the burden shifted to the prosecution to show proper justification. (*People* v. *Henry* (1967) 65 Cal.2d 842, 845 [56 Cal.Rptr. 485, 423 P.2d 557], and cases cited.) The search was clearly incident to the arrest of Lara, and hence was not "unreasonable" within the meaning of Fourth Amendment if that arrest was lawful. (*People* v. *Webb* (1967) 66 Cal.2d 107, 111-112 [56 Cal.Rptr. 902, 424 P.2d 342].) In turn, the arrest was lawful if its was predicated on reasonable cause to believe Lara had committed a felony. (*Ibid.*) "The question of probable cause to

---

[2]During the presentation of the People's case both defendants put on testimony, hereinafter discussed, limited to the question of the admissibility of their extrajudicial statements.

justify an arrest without a warrant must be tested by the facts which the record shows were known to the officers at the time the arrest was made.'' (*People* v. *Talley* (1967) 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564].) ▮▮▮ After a full hearing of the matter the trial court found the officer had such cause, and there is sufficient evidence to support its determination. (See *Ker* v. *California* (1962) 374 U.S. 23, 33 [10 L.Ed.2d 726, 737-738, 83 S.Ct. 1623] ; *People* v. *Talley* (1967) *supra*, 65 Cal.2d at p. 837.)

Officer Miller acted on information supplied by the Los Angeles Police Department, which had telephoned a request to the South Gate Police Department to take Lara into custody on the charge of murdering Raymond Mitchell. Officer Miller was entitled to make an arrest on the basis of this information, as it was received through official channels. (*People* v. *Webb* (1967) *supra*, 66 Cal.2d 107, 112, and cases cited.) Of course, as there was no outstanding warrant for Lara's arrest the prosecution was also required to show (*People* v. *Pease* (1960) 242 Cal.App.2d 442, 450 [51 Cal.Rptr. 448]) that the officer who initiated the request had reasonable cause himself to believe that Lara had committed a felony (*People* v. *Cartier* (1959) 170 Cal.App.2d 613, 617-618 [339 P.2d 172]).

▮▮▮ On the latter point Officer Taggart testified, as noted above, that in his interview with Meza at the Pasadena jail on the evening of May 25, Meza related that the victim had taken him for a ride between 1 :30 and 2 a.m. on May 23, that two individuals subsequently identified as Lara and Alvarez had entered the car, that Meza had been driven home at his request, and that about 3 :30 the following afternoon Alvarez told Meza that ''him and his buddy, Tony, had shot and killed this fellow that had given him a ride home that night.''

Under settled rules (e.g., *People* v. *Prewitt* (1959) 52 Cal. 2d 330, 337 [341 P.2d 1], and cases cited), this information would have constituted reasonable cause for arresting Lara and Alvarez if it had been furnished by a tested informant who had proved reliable on previous occasions. Meza had not been tested in this manner, and was under arrest at the time of his statement. ▮▮▮ But information given by an untested informant or arrestee is nevertheless sufficient if it is ''corroborated, in essential respects, by other facts, sources or circumstances.'' (*People* v. *Reeves* (1964) 61 Cal.2d 268, 274 [38 Cal.Rptr. 1, 391 P.2d 393].) Such corroboration need not itself amount to reasonable cause to arrest; its only pur-

pose is to provide the element of "reliability" missing when the police have had no prior experience with the informant. Accordingly, it is enough if it gives the officers reasonable grounds to believe the informant is telling the truth, for in this type of case the issue is "not whether the information obtained by the officers emanated from a reliable source, but whether the officers could reasonably rely upon that information under the circumstances." (*People* v. *Sandoval* (1966) 65 Cal.2d 303, 308-309 [54 Cal.Rptr. 123, 419 P.2d 187], citing *Willson* v. *Superior Court* (1956) 46 Cal.2d 291, 294-295 [294 P.2d 36].)

Here the investigating officers knew, independently of Meza's information, that a felony had been committed. From the nature of the wounds they knew that Mitchell had been killed by one or more shotgun blasts; and from the fact he had been bound and shot in the back, they could reasonably infer the killing was murder. They could also infer that Mitchell's car had been involved in the perpetration of the crime, as it was found abandoned some two miles from the scene of the shooting. Meza, it will be remembered, told the officers that Lara and Alvarez were in Mitchell's car on the night in question, and that Alvarez subsequently said they had killed Mitchell by shooting him. Further independent investigation by the police disclosed that friends of Mitchell had last seen the deceased in the company of a man identified to be Meza; and the coroner's examination determined that death occurred in the period between the time that Meza had been taken home by Mitchell and the time he had been told of the shooting by Alvarez. Viewed together, these independently established facts justified the officers in placing reasonable reliance on Meza's information for the limited purpose here in issue. (See *People* v. *Talley* (1967) *supra,* 65 Cal.2d 830, 837.)

The record shows that prior to making his confession each defendant was fully and repeatedly advised of his right to counsel, his right to remain silent, and that anything he said could be used against him in court. Such admonitions were adequate to comply with the mandate of *People* v. *Dorado* (1965) *supra,* 62 Cal.2d 338. (*People* v. *Sanchez* (1967) 65 Cal.2d 814, 824 [56 Cal.Rptr. 648, 423 P.2d 800]; *People* v. *Thomas* (1967) 65 Cal.2d 698, 704-705 [56 Cal.Rptr. 305, 423 P.2d 233], and cases cited.)[3] Both defendants contend, how-

---

[3]As the trial in this case took place before the date of *Miranda* v. *Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d

ever, that the record also shows they did not "intelligently and understandingly" waive the foregoing rights. The facts are otherwise.

 Defendants stress that they are members of a minority group (Mexican-American); that they have little education (ninth or tenth grade), and no money; that they are minors;[4] and that through lack of sleep and excessive drinking each was allegedly in poor physical and mental condition at the time he was questioned by the police. Such factors have often been considered by the courts in determining the voluntariness of an ensuing confession (see, e.g., *Blackburn* v. *Alabama* (1960) 361 U.S. 199 [4 L.Ed.2d 242, 80 S.Ct. 274]; *Payne* v. *Arkansas* (1958) 356 U.S. 560 [2 L.Ed.2d 975, 78 S.Ct. 844]; *Gallegos* v. *Colorado* (1962) 370 U.S. 49 [8 L.Ed. 2d 325, 82 S.Ct. 1209, 87 A.L.R.2d 614]), and there is no doubt they are also relevant to the question whether a waiver of *Dorado* rights at the outset of an interrogation was intelligently and understandingly made. (See *People* v. *Sanchez* (1967) *supra*, 65 Cal.2d 814, 825-826.) Lara further complains, however, that the police did not inform him of "the elements of the crimes charged against him," "the possible defenses available to him," and the fact that "he could receive the death penalty." There is no requirement that an accused be informed of these matters while the case is still in the stage of interrogation by investigating officers. Indeed, it would usually be impossible to do so, for at that stage no crimes have yet been "charged against him"; the latter decision is subsequently made by the district attorney, after appraising the legal effect of the evidence gathered from all sources in the case.

 The issue, as with all matters of waiver, is to be resolved upon the whole record. (See *Johnson* v. *Zerbst* (1938) 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]; *In re Johnson* (1965) 62 Cal.2d 325, 335 [42 Cal.Rptr. 228, 398 P.2d 420].) Here the officers specifically asked each defendant if he understood the statement of rights just given to him, and each replied that he did.[5] There was testimony that at the time of the questioning

974], the standards there laid down are not controlling. (*People* v. *Rollins* (1967) 65 Cal.2d 681 [56 Cal.Rptr. 293, 423 P.2d 221].)

[4] At the time of the commission of the crime Lara was 18 years old and Alvarez was 38 days short of his 18th birthday.

[5] Indeed, on each occasion that Lara was advised he said to the officers, "You don't have to tell me a thing. I know my Constitutional rights";

Lara was "very calm" and gave no indication of having consumed alcoholic beverages, and Alvarez appeared "cognizant and aware." Each defendant, moreover, concluded his handwritten confession with a full statement of his *Dorado* rights. Also relevant is the fact that each defendant, though young, had had considerable experience with the police and the courts. (*People* v. *Reeves* (1966) 64 Cal.2d 766, 775 [51 Cal.Rptr. 691, 415 P.2d 35].) Thus Alvarez admitted to the defense psychologist that "he had had more arrests and convictions than he could remember since the age of 11 or 12. He had been used to this type of environment [i.e., incarceration]"; and Lara testified that only four months before his arrest in the present case he had been arrested on a narcotics charge and had been informed he had a right to counsel and to remain silent and that anything he said could be used against him, and court-appointed counsel had in fact been furnished to him. The foregoing facts distinguish this case from *People* v. *Hildabrandt* (1966) 244 Cal.App.2d 423 [53 Cal.Rptr. 99], in which the interrogating officer merely "assumed" the defendant understood an admonition as to his rights to counsel and to remain silent, the defendant "steadfastly refused to sign" any statement in writing, and the evidence disclosed his "lack of prior experience in criminal matters."

Alvarez called Eugene M. Blumberg, a Ph.D. in clinical psychology, as an expert witness on this issue. Dr. Blumberg testified he had administered the standard intelligence quotient tests to Alvarez and had concluded that the latter had an I.Q. of 65 to 71, characterized as "mild mental retardation," with a "mental age" of 10 years and 2 months. The witness gave as his opinion that Alvarez did not have the ability to understand the nature and effect of relinquishing his rights to counsel at the interrogation. On cross-examination Dr. Blumberg stated he did not think Alvarez was knowledgeable enough to realize he would benefit by falsifying his answers to the tests. The witness conceded, however, that the findings negated the possibility that Alvarez might have been "in a state of unawareness at the time the act was committed." He admitted further that Alvarez "understood the meaning of the words" in the *Dorado* admonition he was given, but asserted he would not have understood "the subtleties or the nuances."

---

and when asked if he understood the admonition he replied, "Yes, I knew it before."

In rebuttal the People first called Deputy Sheriff Campos, a Spanish-speaking police officer. He testified that two days previously he escorted Lara and Alvarez back to their holding cells after they had a conference with their attorneys and a photographer; he was walking some five feet behind the defendants when he heard Alvarez say in Spanish to Lara, "If they call on me, I am going to play the crazy part, like I am crazy."

The People also put an expert witness on the stand, John Paul Walters, an M.D. and practicing psychiatrist. Dr. Walters testified that on the basis of his examination of Alvarez, the latter had the ability or capacity to understand the rights explained to him and their basic significance, and to understand what it meant to waive those rights. The witness testified that the I.Q. tests administered to Alvarez were designed for large screening operations and would not show whether an individual being tested could comprehend the nature and consequences of an admonition such as here involved. Dr. Walters was willing to assume that Alvarez' I.Q. was between 65 and 71 and that his "mental age" was 10 years and 2 months; he explained, however, that this "does not mean that he is functioning as a person at the age of ten years and two months. . . . It means that that is his capacity to learn as a person of ten years, two months. He is living as a 17-year-old and he has the accumulated life experience as a 17-year-old person. I think that one can't isolate a result on an intelligence test and say that this represents the entire individual. This represents a very small portion of the individual. What this individual does with his time, how he lives, is the important thing. . . . He is functioning as a person of his chronological age." Dr. Walters characterized as "innate shrewdness" Alvarez' request to talk to Lara before making a statement, and concluded that when Alvarez waived his *Dorado* rights "He did what he wanted to do and he knew at that time what he wanted to do."

The matter was thus explored at length, and the trial court found on the basis of all the testimony that Alvarez had the capacity to understand the meaning of the *Dorado* admonition he was given and the effect of waiving his rights. The record supports this finding.

We cannot accept the suggestion of certain commentators (see 7 Santa Clara Lawyer 114, 127 (1966); 40 Wash. L.Rev. 189, 200-201 (1965)) that every minor is incompetent as a matter of law to waive his constitutional rights to remain silent and to an attorney unless the waiver is consented to by

an attorney or by a parent or guardian who has himself been advised of the minor's rights. Such adult consent is of course to be desired, and should be obtained whenever feasible. But as we will explain, whether a minor knowingly and intelligently waived these rights is a question of fact; and a mere failure of the authorities to seek the additional consent of an adult cannot be held to outweigh, in any given instance, an evidentially supported finding that such a waiver was actually made.

We recognize that in a number of respects minors enjoy a privileged status in our law. One of the primary concerns of the Legislature has been to protect minors from suffering unfair treatment in their dealings with adults simply by reason of their immaturity. Perhaps the most conspicuous examples of this solicitude are found in the law of contracts, under which a minor is generally deemed to lack the capacity to enter into a binding agreement (Civ. Code, §§ 33, 34, 35, 1556), in the Uniform Gifts to Minors Act (Civ. Code, § 1154 et seq.), under which a custodian must be designated to receive and hold title to property transferred to minors, and in labor law, which provides a detailed statutory scheme for the protection of minors in employment.[6]

More relevant here, however, are those provisions of the law governing acts of wrongdoing by a minor. At this point society's interest in self-preservation intervenes,[7] and the resulting law is an attempt to reconcile that interest with the general concern for the minor's welfare. Thus although he is held to a correspondingly lower standard of care than a com-

---

[6] For example, a minor may assign his wages only with the consent of a parent. (Lab. Code, § 300, subd. (c).) Minors under various ages may not be employed for less than a specified minimum wage (Lab. Code, § 1197) or more than a fixed maximum number of hours (Lab. Code, § 1391) or in certain occupations (Lab. Code, §§ 1293, 1308) or places of work (Lab. Code, § 1294)), and limited exceptions to the foregoing may be granted only upon the consent of the Labor Commissioner (Lab. Code, §§ 1395-1397). (See also Civ. Code, § 36 [superior court approval required of contracts employing minors to perform artistic services or participate in professional sports].)

[7] "Youth is apparently responsible for a substantial and disproportionate part of the national crime problem." (The President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society (1967), p. 55.) In 1965, on a nationwide basis, persons under 18 accounted for one-fifth of all arrests for crimes other than traffic violations and one-half of all arrests for serious property offenses. (Id. at pp. 55-56.) In California the figures are similar. (See Study of the Bureau of Criminal Statistics, Department of Justice of the State of California, Crime & Delinquency in California: 1965, pp. 141-145.)

petent adult, "A minor, or person of unsound mind, of whatever degree, is civilly liable for a wrong done by him. . . ." (Civ. Code, § 41; see also *Singer* v. *Marx* (1956) 144 Cal.App. 2d 637, 641-644 [301 P.2d 440]; *Ellis* v. *D'Angelo* (1953) 116 Cal.App.2d 310, 313 [253 P.2d 675] [recognizing that the legislative declaration is clear and represents the general rule].) And while the theory of such liability may be to compensate the victim rather than to punish the tortfeasor (see *Ellis* v. *D'Angelo, supra,* 116 Cal.App.2d at pp. 313-314), section 41 further authorizes the imposition of exemplary damages if "at the time of the act he was capable of knowing that it was wrongful." Whether he had such capacity, it will be observed, is a question of fact to be resolved in the particular circumstances of each case.

When the wrongdoing of the minor is not simply a tort but amounts to a crime, a more complex set of laws comes into play. On the one hand, a special system of juvenile courts has been created to deal with such cases in an essentially nonpenal manner, for the protection and benefit of the minor. (Welf. & Inst. Code, div. 2, pt. 1, ch. 2.)[8] On the other hand, if the minor is 18 or over the general criminal court retains primary jurisdiction of his case and need not certify him to the juvenile court (Welf. & Inst. Code, § 604, subd. (b)); and if he is 16 or over he may be tried as an adult on a felony charge if the juvenile court finds him "not a fit and proper subject" for consideration under the special law (Welf. & Inst. Code, § 707; see 40 Ops.Cal.Atty.Gen. 83 (1962)). As to the question of liability, all minors of 14 or over are deemed "capable of committing crimes"; and those under 14 are excepted from this general rule, "in the absence of clear proof that at the time of committing the act charged against them, they knew its wrongfulness." (Pen. Code, § 26, subd. One.) As to punishment, minors of 18 or over may be imprisoned in adult institutions (Welf. & Inst. Code, §§ 507, 508); and the death

[8]Certain of the general criminal laws also contain provisions for the benefit of minors. Thus Penal Code section 858 declares in part that "When the defendant is brought before the magistrate upon an arrest, . . . the magistrate must immediately inform him . . . of his right to the aid of counsel in every stage of the proceedings. . . . [A]nd if the magistrate concludes that it is probable that the defendant is a minor, . . . he shall immediately either notify the parent or guardian of the minor, by telephone, telegram, or messenger, of the arrest, or appoint counsel to represent the minor." (See also Pen. Code, § 859.) But as we noted in *People* v. *Eli* (1967) 66 Cal.2d 63, 75 [56 Cal.Rptr. 916, 424 P.2d 356], "those sections place a duty on the magistrate, not the police, to notify the parents." Accordingly, they do not govern the stage of the proceedings with which we are here concerned.

penalty may be imposed, as it has been here on defendant Lara, on minors who are 18 or over at the time of committing the crime (Pen. Code, § 190.1).

In short, with respect to tortious or criminal acts of minors, the law extends no blanket presumption of incapacity. Rather, while the minor's immaturity will often result in his undergoing different methods of adjudication and treatment, it is simply one element, although an important one, to be weighed with many others in determining the issue of his liability. It is clear the Legislature intends that determination to be made on the particular facts of each case.

A similar approach has been taken by the courts in dealing with other stages of the criminal process. The most common context in which the issue has arisen is in ruling whether a minor has the capacity to make a voluntary extrajudicial confession. The leading cases on this point are *Haley* v. *Ohio* (1948) 332 U.S. 596 [92 L.Ed. 224, 68 S.Ct. 302], and *Gallegos* v. *Colorado* (1962) *supra*, 370 U.S. 49.

In *Haley* a 15-year-old Negro boy was arrested shortly after midnight on a robbery-murder charge. He was interrogated by relays of police officers, without being advised of his right to counsel, and at 5 a.m. he orally confessed. After being informed that he had a right to remain silent and that his statement might be used against him, he signed a written version of his confession. He was thereafter held incommunicado for three days before being arraigned.

The United States Supreme Court reviewed the foregoing undisputed evidence and held that the confession was obtained by unconstitutional methods and its introduction in evidence therefore violated due process. The court reasoned that "when, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. Age 15 is a tender and difficult age for a boy of any race. He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. This is the period of great instability which the crisis of adolescence produces. A 15-year-old lad, questioned through the dead of night by relays of police, is a ready victim of the inquisition. Mature men possibly might stand the ordeal from midnight to 5 a.m. But we cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of

fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him." (332 U.S. at pp. 599-600 [92 L.Ed. at pp. 228-229].)

Rejecting the argument that the defendant was at least partly advised of his rights and must be presumed to have waived them by confessing, the court said: "That assumes, however, that a boy of fifteen, without aid of counsel, would have a full appreciation of that advice and that on the facts of this record he had a freedom of choice. We cannot indulge those assumptions." (*Id.* at p. 601 [92 L.Ed. at p. 229].)

Again, in *Gallegos* a 14-year-old boy orally confessed to an assault and robbery immediately upon his arrest. He was held incommunicado for five days, without interrogation but without being allowed to see a lawyer, relative or friend. At that point he signed a formal confession which was subsequently used against him in a murder prosecution when his victim died. The Supreme Court reviewed the facts and, following *Haley*, held that the formal confession was obtained in violation of the defendant's constitutional rights. The court observed, "The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. . . . He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights—from someone concerned with securing him those rights—and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not." (370 U.S. at p. 54 [8 L.Ed.2d at p. 328].)

We acknowledge that the immaturity of most minors will make it desirable for those in custody to have the advice of counsel or other responsible adult. For our present purposes, however, the primary significance of *Haley* and *Gallegos* is that the high court declined to hold that as a matter of law all minors without such advice lack the capacity to make voluntary confessions. Rather, the court's approach was clearly implied in its conclusion in *Haley* (332 U.S. at pp. 600-601 [92 L.Ed. at pp. 228-229]) that "The age of petitioner, the hours when he was grilled, the duration of the quizzing, the

fact that he had no friend or counsel to advise him, the callous attitude of the police towards his rights *combine* to convince us that this was a confession wrung from a child by means which the law should not sanction." (Italics added.) More specifically, Mr. Justice Frankfurter observed in his concurring opinion in that case (332 U.S. at p. 603 [92 L.Ed. at p. 230]) that "If a State, consistently with the Fourteenth Amendment, may try a boy of fifteen charged with murder by the ordinary criminal procedure, *I cannot say that such a youth is never capable* of that free choice of action which, in the eyes of the law, makes a confession 'voluntary,' " and "whether a confession of a lad of fifteen is 'voluntary' and as such admissible, or 'coerced' and thus wanting in due process, *is not a matter of mathematical determination.*" (Italics added.) Reaffirming this view, the *Gallegos* court carefully explained (370 U.S. at pp. 52, 55 [8 L.Ed.2d at pp. 327, 329]) that application of the principles excluding the use of coerced confessions "involves close scrutiny of the facts of individual cases," and "There is no guide to the decision of cases such as this, except *the totality of circumstances* that bear on the two factors we have mentioned. The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—*all these combine* to make us conclude that the formal confession on which this conviction may have rested [citation] was obtained in violation of due process." (Italics added.)

 This, then, is the general rule: a minor has the capacity to make a voluntary confession, even of capital offenses, without the presence or consent of counsel or other responsible adult, and the admissibility of such a confession depends not on his age alone but on a combination of that factor with such other circumstances as his intelligence, education, experience, and ability to comprehend the meaning and effect of his statement. (See cases collected in Note, 87 A.L.R.2d 624.) Applying the "totality of circumstances" test of *Gallegos*, such confessions have been held admissible when made by a minor of the age of fourteen,[9] fifteen,[10]

---

[9]*People* v. *Connolly* (1965) 33 Ill.2d 128 [210 N.E.2d 523, 525-526], cert. den. 384 U.S. 1023 [16 L.Ed.2d 1027, 86 S.Ct. 1959] [murder]; cf. *People* v. *De Flumer* (N.Y. 1965) 261 N.Y.S.2d 42 [murder confession of 14-year-old held voluntary, although not put in evidence].

[10]*Hayden* v. *State* (1964) 245 Ind. 591 [199 N.E.2d 102, 107-108, 201 N.E.2d 329] [murder; opinion distinguishes *Gallegos* on its facts];

sixteen,[11] seventeen,[12] eighteen,[13] nineteen,[14] or twenty.[15] As the court concluded in *State* v. *Carder* (Ohio 1965) *supra*, 210 N.E.2d 714, 719, after reviewing the facts surrounding the murder confession of a 16-year-old youth, "Under this 'totality of circumstances,' for his statements to be inadmissible we would have to hold that any self-incrimination of a person under 18 years old is involuntary unless his parents or his attorney are present. We would also have to hold that such minor is not mature enough to make a voluntary confession or waive the presence of his parents or his lawyer during any conversation with the police. *This is not the law.*" (Italics added.)

Nor is it the law in California, where our courts uniformly follow the "totality of circumstances" rule. Thus in *People* v. *Magee* (1963) 217 Cal.App.2d 443 [31 Cal.Rptr. 658], confessions of robbery-murder taken from two 16-year-old and two 17-year-old defendants were used at their trial, which resulted in first degree murder convictions of all four. Contending on appeal that his confession must be deemed involuntary, defendant Magee argued that "any statement by a minor to the police is the result of an implied promise of immunity [i.e., from further proceedings other than in juvenile court]." (*Id.* at p. 455.) The contention apparently sought to invoke the special federal rule of *Harling* v. *United States* (D.C. Cir. 1961) 295 F.2d 161 [111 App.D.C. 174], which bars the government from using in a prosecution in a district court under the general criminal law any incriminating statement taken from a minor during the period he was detained under the auspices of the juvenile court; to hold otherwise, the *Harling* court reasoned, "would be tantamount

---

*Commonwealth* v. *Green* (1959) 396 Pa. 137 [151 A.2d 241, 244] [murder].

[11]*State* v. *White* (1965) 146 Mont. 226 [405 P.2d 761, 765-766] [murder]; *State* v. *Carder* (1965) 3 OhioApp.2d 381 [210 N.E.2d 714] [murder; opinion distinguishes *Haley* and *Gallegos* on their facts].

[12]*United States* ex rel. *Smith* v. *New Jersey* (3d Cir. 1963) 323 F.2d 146, 149-150 [murder; opinion distinguishes *Haley* and *Gallegos* on their facts]; *Green* v. *State* (1964) 236 Md. 334 [203 A.2d 870 [murder and rape]; *State* v. *Stewart* (1964) 176 Ohio St. 156 [198 N.E.2d 439, 441-442], cert. den. 379 U.S. 947 [13 L.Ed.2d 544, 85 S.Ct. 443] [murder]; *Clark* v. *State* (Okla.Crim.App. 1952) 246 P.2d 422 [burglary].

[13]*Gilbert* v. *State* (Tex.Crim.App. 1953) 265 S.W.2d 100, 103 [murder]; *State* v. *Mares* (Utah 1948) 192 P.2d 861 [murder].

[14]*De Souza* v. *Barber* (9th Cir. 1959) 263 F.2d 470, 476-477 [deportation proceedings].

[15]*State* v. *Kelley* (1962) 253 Iowa 1314 [115 N.W.2d 184] [murder]; cf. *Roberts* v. *Beto* (S.D. Tex. 1965) 245 F.Supp. 235 [murder].

to a breach of faith with the child'' and ''would destroy the Juvenile Court's *parens patriae* relation to the child'' (*id.* at pp. 163-164).[16]

The California court expressly declined to adopt the *Harling* rule, observing that ''there is no rule of this state making inadmissible statements made by juveniles to police officers or even to probation officers, between the time of their detention and the determination of the juvenile court as to whether they will be kept in the juvenile court or turned over for trial to the criminal courts.

''We see no reason at this time for making such statements inadmissible. In determining the character of their statements, that is, whether they are free and voluntary, the age of the person should be considered, but to rule out all statements merely because of the youth of the maker, would unduly restrict law enforcement.'' (217 Cal.App.2d at pp. 456-457.)

The court then reviewed the circumstances surrounding the confessions of each of the defendants and concluded they were voluntarily given, distinguishing *Haley* on its facts. (*Id.* at pp. 465-466.) We denied a hearing, and the United States Supreme Court denied certiorari (376 U.S. 925 [11 L.Ed.2d 620, 84 S.Ct. 688]).

Among the circumstances emphasized by the courts as tending to show that the minor possessed the capacity required to make a voluntary confession are his prior experience with the police and courts (*United States* ex rel. *Smith* v. *New Jersey, supra*; *Roberts* v. *Beto, supra*; *Clark* v. *State, supra*) and the fact that advice as to his legal rights was given to him before he confessed (*State* v. *Stewart, supra*; *State* v. *White, supra*; *Clark* v. *State, supra*) ; each of these elements, it bears noting, is also present in the case at bar. On the other hand, if the minor is mentally retarded or of subnormal intelligence for his age, as is true of defendant Alvarez, that is a factor weighing heavily against a finding of capacity. Yet even the presence of such mental subnormality does not require the automatic exclusion of the minor's confession, and the ''totality of circumstances'' test still applies.

Thus in *Reck* v. *Pate* (1961) 367 U.S. 433 [6 L.Ed.2d 948, 81 S.Ct. 1541], a murder confession was given by a 19-year-

---

[16]Further discussing this rule in *Edwards* v. *United States* (D.C. Cir. 1964) 330 F.2d 849, 850-851, the court explained that ''The purpose of *Harling* is not to deter improper police conduct, since the interrogation by the officers of juveniles being detained is usually not improper.''

old Negro youth who had repeatedly been classified as mentally retarded and was found to have the intelligence of a 10- or 11-year-old child at the time of trial. In holding the confession inadmissible because obtained by coercion, the high court did not rule that as a matter of law all mentally retarded minors lack the capacity to make such confessions; rather, the court proceeded from the general principle that "In resolving the issue all the circumstances attendant upon the confession must be taken into account." (*Id.* at p. 440 [6 L.Ed.2d at p. 953].) The court then reviewed the undisputed facts, stressing not only the defendant's age and subnormal intelligence but also his lack of prior experience with the police, the inordinate length of his detention, the relentless and sustained interrogation, the absence of counsel. family or friend, and the defendant's apparent hunger and sickness. It was on the basis of "this total combination of circumstances" (at p. 442 [6 L.Ed.2d at p. 954]) that the court found the confession to have been involuntary. (Accord, *Payne* v. *Arkansas* (1958) *supra,* 356 U.S. 560, 567 [2 L.Ed.2d at p. 980] ["mentally dull" 19-year-old Negro]; cf. *Townsend* v. *Sain* (1963) 372 U.S. 293 [9 L.Ed.2d 770, 83 S.Ct. 745] [19-year-old "near mental defective . . . just a little above moron"]; *Mallory* v. *United States* (1957) 354 U.S. 449 [1 L.Ed.2d 1479, 77 S.Ct. 1356] [19-year-old "of limited intelligence"].)

Again, the general rule governs: the mental subnormality of an accused does not ipso facto render his confession inadmissible, but is simply one factor, albeit of significant weight, to be considered with all others bearing on the question of voluntariness. (See cases collected in Note, 69 A.L.R.2d 348.)[17] As we said in *People* v. *Tipton* (1957) 48 Cal.2d 389, 393-394 [309 P.2d 813], "a confession is not rendered inadmissible . . . by a low emotional and mental stability on the part of the suspect if he is nevertheless capable of understanding the meaning and effect of his confession [citation]. Such matters may be taken into consideration in determining whether a particular confession was voluntarily made." (Accord, *People* v. *Isby* (1947) 30 Cal.2d 879 [186 P.2d 405] [murder; 26-year-old "well down the scale of feeble-mindedness," with a mental age of 8 years and 8 months and an I.Q. of 58; as a question of fact, confession held admissible].)

---

[17]The same rule controls the admissibility of a confession taken from an accused whose mental capacity was impaired at the time by intoxication (see Note, 69 A.L.R.2d 361) or by the influence of drugs (see Note, 69 A.L.R.2d 384).

Applying this rule, a substantial number of courts have held admissible confessions made by minors of subnormal mentality. For example, in *State* v. *Ordog* (1965) 45 N.J. 347 [212 A.2d 370], one defendant charged with murder had a chronological age of 19 years but, according to expert testimony, the intelligence of a 7-year-old and the judgment of a 6-year-old. Another defendant was 17 years old, but possessed a borderline intelligence, was a chronic schizophrenic, and had been a patient at a state mental hospital after committing the murder. The New Jersey Supreme Court held their confessions admissible under all the circumstances of the case, distinguishing *Haley* and *Gallegos* on their facts. Similar determinations have been made as to the confession of a 17-year-old mentally retarded epileptic patient in a state hospital (*State* v. *Faught* (1963) 254 Iowa 1124 [120 N.W.2d 426]), a 15-year-old with the mental capacity of a 12-year-old and unable to read or write (*Michaud* v. *State* (1965) 161 Me. 517 [215 A.2d 87]), a 15-year-old mentally deficient with an I.Q. of 74 to 80 (*Bean* v. *State* (1964) 234 Md. 432 [199 A.2d 773]), a 15-year-old who had escaped from a state mental hospital only two days before his arrest (*State* v. *Ortega* (1966) 77 N.M. 7 [419 P.2d 219]), a 14-year-old with a mental age of 11 years and 4 months and an I.Q. of 79 (*Johnson* v. *Commonwealth* (1945) 184 Va. 466 [35 S.E.2d 770, 772]), and a 20-year-old moron with the mental capacity of an 8- or 9-year-old (*State* v. *Watson* (1946) 114 Vt. 543 [49 A.2d 174]).[18]

An equally persuasive analogy may be found in the cases dealing with waiver of counsel at trial. There again, it is settled that "The determination of whether there has been an intelligent waiver of the right to counsel must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." (*Johnson* v. *Zerbst* (1938) *supra,* 304 U.S. 458, 464 [82 L.Ed. 1461, 1466]; accord, *In re Johnson* (1965) *supra,* 62 Cal.2d 325, 335.) This rule applies to minors as well as adults, and the age of the defendant is simply a factor, although an important one, to be weighed with many others in

[18]Accord, *People* v. *Townsend* (1957) 11 Ill.2d 30 [141 N.E.2d 729, 69 A.L.R.2d 371], cert. den. 355 U.S. 850 [2 L.Ed.2d 60, 78 S.Ct. 76] [19-year-old of "below normal" I.Q.]; *State* v. *Falbo* (Mo. 1960) 333 S.W.2d 279, 285 [mentally ill 15-year-old]; *Commonwealth* v. *Krzesniak* (1956) 180 Pa.Super. 560 [119 A.2d 617] [19-year-old with mentality of 8- or 9-year-old]; see also *State* v. *Nichols* (1965) 3 Ohio App.2d 182 [209 N.E.2d 750] [error to exclude expert testimony to support claim of subnormal mentality of 18-year-old, bearing *inter alia* on admissibility of his confession].

determining in any given case whether there has been a knowing and intelligent waiver of counsel. (See cases collected in Note, 71 A.L.R.2d 1160.)

The rule was clearly delineated in *Williams* v. *Huff* (D.C. Cir. 1944) 142 F.2d 91 [79 App.D.C. 31]. In applying for a writ of habeas corpus, the defendant alleged that at the time he pleaded guilty to a charge of aggravated assault he was 17 years old, was not represented by counsel, and had not intelligently waived counsel. Writing for the court, Justice Edgerton recognized (at p. 92) that "Because the interests of society must be protected boys of seventeen are held competent, with certain limitations, to commit crimes and torts." But he also stressed the various civil disabilities of minors, and remarked, "It seems to me to follow as a matter of law that a boy of seventeen cannot competently waive his right to counsel in a criminal case." However, he acknowledged that "In saying this I do not speak for the court," and concluded, in accord with the general rule, that "In view of the majority of the court appellant's competence was a question of fact, in the determination of which his youth was entitled to serious consideration but was not necessarily conclusive. It follows that the District Court should take evidence and determine whether, in the light of his age, education, and information, and all other pertinent facts, he has sustained the burden of proving that his waiver was not competent and intelligent."

The holding of the majority in *Williams* has frequently been followed in the federal courts (see, e.g., *De Souza* v. *Barber* (9th Cir. 1959) *supra*, 263 F.2d 470, 477; *McBride* v. *Jacobs* (D.C. Cir. 1957) 247 F.2d 595, 596 [101 App.D.C. 189]; *Shioutakon* v. *District of Columbia* (D.C. Cir. 1956) 236 F.2d 666, 670 [98 App.D.C. 371, 60 A.L.R.2d 686]; *Curtis* v. *Hiatt* (3d Cir. 1947) 161 F.2d 621, 623), and is the law of California. In *People* v. *Hardin* (1962) 207 Cal.App.2d 336 [24 Cal.Rptr. 563], an 18-year-old defendant purportedly waived counsel before pleading guilty to being an accessory to burglary. The Court of Appeal observed that "Although minority itself would not prevent an intelligent waiver [citation], it is an important circumstance to be observed in the consideration of the other factors of the case" (at pp. 340-341). After reviewing the "other factors" bearing on the validity of the purported waiver, the court held it to be ineffective, concluding (at p. 343), "We observe that there is a combination of circumstances which differentiates the particular case before us from very many others, in the youth of

the accused, the intricacy of the offense, and the defectiveness of the information.''

By contrast, in *People* v. *Williams* (1959) 174 Cal.App.2d 364 [345 P.2d 47], a 20-year-old defendant was found guilty of first degree murder after waiving counsel at trial. On appeal he contended that because he was a minor and was ''acting alone'' he did not have ''the capacity to intelligently waive his counsel,'' emphasizing his various civil disabilities. In rejecting this contention, the Court of Appeal reasoned that ''As to appellant's argument concerning the disqualification attached to minors in various affairs of life, we are persuaded that since the court was clothed with jurisdiction to try him, and that is conceded, then in our opinion he had the right to waive or refuse appointment of counsel if at the time he did so, he had an intelligent conception of the consequences of his act'' (at p. 379). The court then reviewed the totality of the circumstances surrounding the waiver, including the defendant's prior experience with the police and courtroom procedure, his active and able management of his defense, and the frequent advice and assistance of the trial judge. On this basis, the court concluded (at p. 380) that ''The record before us does not warrant any inference other than that the waiver was an intelligent one by a person possessing the requisite capacity to waive his right to counsel.'' The judgment was affirmed, and we denied a hearing.[19]

To sum up, we have seen that a minor, even of subnormal mentality, does not lack the capacity as a matter of law to make a voluntary confession without the presence or consent of counsel or other responsible adult, or to make a knowing and intelligent waiver of his right to counsel at trial; in either event, the issue is one of fact, to be decided on the ''totality of the circumstances'' of each case. ▮▮▮ We are of the opinion that the same rule governs the issue of the effectiveness of a minor's waiver of his rights to counsel and to remain silent after the accusatory stage has been reached in a pretrial investigation.

Two recent decisions from our sister state of Oregon so hold. In *State* v. *Gullings* (1966) 244 Ore. 173 [416 P.2d

[19]In *De Souza* v. *Barber, supra,* 263 F.2d 470, 476 and fn. 11, the Ninth Circuit Court of Appeals brushed aside a similar argument predicated on the civil disabilities of a minor, reasoning that ''A statutory definition of minority, without more, does not in itself render inadmissible confessions or admissions of an infant,'' and that the relevant California civil statutes ''are not, in our opinion, controlling with respect to admissions and waiver of counsel by minors.''

311], the 17-year-old defendant was arrested for burglary on a detention warrant issued by the juvenile court. The arresting officer promptly and effectively advised him that any information secured could be used in a criminal prosecution against him, that he was entitled to counsel at state expense, and that he had an absolute right to remain silent. The defendant nevertheless made incriminating statements, produced part of the burglary loot, and signed a written confession. The latter was found to be voluntary when subsequently admitted at his trial in adult court, which resulted in conviction.

On appeal, the Oregon Supreme Court unanimously upheld the admissibility of the challenged confession. First, the court declined to adopt the rigid federal rule of *Harling* v. *United States* (D.C. Cir. 1961) *supra*, 295 F.2d 161, which excludes from criminal trials all confessions taken from a minor in custody of juvenile authorities, "regardless of the circumstances under which they are secured"; rather, the court stated that if Fifth and Sixth Amendment rights are preserved "we believe that an absolute prohibition is not required so long as it is made clear to the juvenile that criminal responsibility can result and that the questioning authorities are not operating as his friends but as his adversaries." (416 P.2d at p. 313.) The court further explained (at p. 314) that "The *parens patriae* relationship does not exist between police and child but between court and child. Police are in the business of solving transgressions against the welfare of society and the apprehension of those who are responsible therefor. They are not engaged in the rehabilitation of the child. . . . So long as information is available which meets constitutional criminal due process standards and which was not secured through the close relationship between court worker and child, the safety and security of the law-abiding public requires its use in adult criminal proceedings."[20]

Turning to the precise issue here under discussion, the court acknowledged (at p. 315) that "It might be argued that a juvenile does not have sufficient understanding to judge whether the situation was adversarial or to intelligently and knowingly waive his right against self-incrimination and his right to be represented by counsel." But the court flatly rejected this argument, reasoning that "It can not be said that a juvenile can not waive constitutional rights as a matter

[20]In support, the court cited such juvenile confession cases as *People* v. *Connolly, supra, Hayden* v. *State, supra, Michaud* v. *State, supra, State* v. *Stewart, supra,* and *Roberts* v. *Beto, supra* (*ante,* fns. 9, 10, 12, 15).

of law. It may be more difficult to prove because of his age, but it is a factual matter to be decided by the trial judge in each case.'' Accordingly, the court reviewed the circumstances disclosed by the record, and concluded that ''the evidence indicates that defendant understood all that was said to him and that he knowingly and freely waived his rights.''

Again, in the companion case of *State* v. *Casey* (1966) 244 Ore. 168, 171 [416 P.2d 665, 666-667], the court upheld the admissibility of robbery confessions by defendants who were 16 and 17 years old respectively. Citing *Gullings*, the court reasoned that ''The age of a juvenile does not rule out the possibility of an intelligent waiver of his Fifth and Sixth Amendment rights. . . . It is a matter of proof in each instance. The trial judge decided the state had carried the burden of proving that defendants had been effectively informed of and had waived such rights and there was, in our opinion, sufficient evidence to justify such a finding.'' For the reasons set forth hereinabove, we reach a similar conclusion on the facts of the case at bar.[21]

▮ The record fails to support Lara's further claim that his confession was ''coerced'' by alleged threats of the police to arrest his girl friend and his sister and to place the children of the latter in juvenile custody. On the contrary, Sergeant Knapp testified that when Lara was brought to the police station shortly after his arrest he asked the officers what they were going to do with his sister and his girl friend. They answered, ''We don't know what we are going to do until we get it straightened out. At the present time your sister could have been arrested for harboring a fugitive, but we don't know what we are going to do.'' During the ensuing 30 to 45 minutes Lara repeatedly approached the officers and asked if they ''would make a deal'' and let the girls go if he were to ''get it straightened out.'' The officers replied there could be no ''deal'' made while the matter was still under investigation.

Lara took the stand, without the presence of the jury, and limited his testimony to a *voir dire* inquiry into the voluntariness of his confession. On direct examination he stated he had confessed because he feared that unless he gave the offi-

---

[21]Our decision herein is not affected by *In re Gault* (1967) 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 428]. That case dealt with the conduct of adjudicatory proceedings in the juvenile court, and the opinion clearly explains that ''we are not here concerned with the procedures or constitutional rights applicable to the pre-judicial stages of the juvenile process. . . .'' (*Id.* at p. 13 [18 L.Ed.2d at p. 538].)

cers the information they wanted they would arrest his girl friend and his sister, and place the latter's children in juvenile custody. On cross-examination, however, he admitted he had initiated the offer to the police to tell them what happened if they would release these same persons, and the officers ''said they couldn't make any deals. . . . I said, 'Well, maybe I can keep them from being arrested if I make a statement.' '' Lara further conceded he knew there was no one left at his sister's house to take care of her children when she was transported to the police station for questioning, and hence that it was to the children's benefit to be brought along with their mother.

The matter was vigorously argued, and the trial court determined that the statement was voluntarily given. The court noted, *inter alia*, that Lara ''made a very sophisticated approach by trying to make a deal with the officers. Both he and the officers agree that he instituted this, not the officers.'' The jurors were then allowed to hear Lara's testimony on this issue,[22] as well as the confession itself, and were properly instructed they could not consider the confession for any purpose unless they first determined that it was voluntarily given (*Jackson* v. *Denno* (1964) 378 U.S. 368 [12 L.Ed.2d 908, 84 S.Ct. 1774, 1 A.L.R.2d 1205] ; *People* v. *Gonzales* (1944) 24 Cal.2d 870, 876-877 [151 P.2d 251] ).[23] Our independent examination of the uncontradicted facts on this issue convinces us that the confession was voluntary. (*People* v. *Underwood* (1964) 61 Cal.2d 113, 121 [37 Cal.Rptr. 313, 389 P.2d 937] ; *People* v. *Berve* (1958) 51 Cal.2d 286, 290-291 [332 P.2d 97], and cases cited.) ▮▮▮ And to the extent that the relevant evidence is in conflict, the resolution of the triers of fact below, which was made under correct rules of law, will not be disturbed on appeal. (*People* v. *Sanchez* (1967) *supra*, 65 Cal. 2d 814, 826.)

▮▮▮ The confession of each defendant implicated the other.[24] On its face, this record shows a violation of the rules

---

[22]In addition to repeating the substance of the testimony he gave on *voir dire*, Lara also agreed on cross-examination that while making his statement the officers did not tell him what to write, that the events which had happened to Raymond Mitchell ''weighed heavily'' on his mind, and that it was ''like a relief from a pressure'' to tell the truth.

[23]We express no opinion as to the procedure to be followed under section 405 of the new Evidence Code, effective January 1, 1967.

[24]Alvarez' confession to the police named Lara as his partner in crime. Although the latter's confession did not mention Alvarez by name, it referred to him consistently as ''this other person''; in the light of other evidence in the case identifying Lara as one of the two persons involved in the shooting, this allusion amounted to an equally damaging implica-

of practice declared in *People* v. *Aranda* (1965) *supra*, 63 Cal.2d 518, 528-531, which require the trial court to determine whether those parts of a confession implicating a codefendant can be effectively deleted without prejudice to the declarant, and if they cannot, to sever the trials or exclude the confession. It must be acknowledged that the present trial took place before *Aranda* was decided, and fully complied with the requirement of limiting instructions under the prior law. However. since the *Aranda* rules govern in all cases still pending on direct review (*People* v. *Charles* (1967) 66 Cal.2d 330 [57 Cal.Rptr. 745, 425 P.2d 545]), the admission into evidence of certain of defendants' unedited confessions constituted error. But *Aranda* makes it clear (63 Cal.2d at p. 527) that the error is reversible only if it causes prejudice. Here, as in *Charles,* each defendant's case was shattered in any event by the impact of his own detailed confession, and the fact that each was also implicated by his codefendant's confession cannot realistically have contributed to either conviction. In these circumstances, we are of the opinion that it is not reasonably probable that a result more favorable to defendants would have been reached had the *Aranda* rules been followed. (Cal. Const., art. VI, § 13; *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

▆▆ We do not mean to imply that a violation of the *Aranda* rules will be automatically nonprejudicial as to any defendant who has made a confession of his own. In every such case the issue remains whether the effect of any circumstances which might otherwise have mitigated the impact of the defendant's confession was overcome by the portions of a codefendant's statement implicating the defendant; in that event, the implication would be prejudicial despite the defendant's own confession. Such a situation might occur, for example, when the confessing defendant presented evidence to show his statement was not freely given, and also denied its truth on the witness stand. ▆▆ In the case before us, however, Lara made no such denial; on the contrary, he admitted he told the police the whole story of what had happened on the night of the killing.

tion by necessary inference. The same reasoning applies to Alvarez' statement to Meza that he and "his buddy, Tony," had shot and killed a fellow who had given him a ride home earlier that morning. On the other hand, no implication of Alvarez appears in Lara's statement to his girl friend that "me and some other ones" shot the victim, or in his statement to his sister that "Him and some boys" committed the crime. (See *People* v. *Aranda* (1965) *supra,* 63 Cal.2d 518, 530-531, fn. 10.)

Defendants' remaining contentions do not require extended discussion. Lara's claim that the jurors were "in effect" instructed on the penalty phase that they were not to be influenced by pity or sympathy is answered by *People* v. *Anderson* (1966) 64 Cal.2d 633, 642-643 [51 Cal.Rptr. 238, 414 P.2d 366], and his effort to distinguish that decision is fruitless.

No useful purpose would be served by detailing Lara's charge of five alleged instances of misconduct by the prosecutor during *voir dire* of the veniremen and argument to the jury. After a careful examination of the record we are of the opinion that several of the remarks in question were ambiguous and it is unlikely they were given the sinister meaning now attributed to them, while the remainder were either corrected by prompt admonition of the trial court or were so trivial that they could not reasonably have affected the verdicts.

 The trial court properly allowed the prosecutor to challenge for cause those prospective jurors who expressed a conscientious objection against imposing the death penalty. (*People* v. *Thomas* (1967) *supra*, 65 Cal.2d 698, 706, and cases cited.) Alvarez objected on the ground that such challenges were not proper as to him because he was not subject to the death penalty in view of his age at the time of the commission of the crime (see fn. 4, *ante*). The court overruled the objection, observing that the challenge was nevertheless proper as to Lara and this was a joint trial. After Alvarez had exhausted all his individual peremptory challenges, Lara declined to join him in a joint challenge of a certain additional juror; Alvarez then requested the court to allow him additional peremptory challenges equal in number to the challenges for cause exercised by the prosecutor on the basis of conscientious objection to the death penalty. Finding no statutory authority for such additional challenges, the court was not in error in denying the request.

There is no merit in Alvarez' contention that the court committed an abuse of discretion in denying his motion for a severance on the foregoing ground. The legislative policy in favor of joint trials of jointly charged defendants (Pen. Code, § 1098) is not outweighed by the circumstance that the prosecutor's challenges for conscientious objection to the death penalty may be technically inapplicable to a codefendant immune from that penalty. Penal Code section 1070.5 carefully prescribes the number of and manner of exercising peremptory challenges by joint defendants, and that statute

does not violate either defendant's right to trial by an impartial jury or any other constitutional right. (*People* v. *King* (1966) 240 Cal.App.2d 389, 398-402 [49 Cal.Rptr. 562], and cases cited.)

 Finally, the record fails to support Alvarez' contention that there was no evidence of the corpus delicti of the crime of kidnaping for the purpose of robbery. When the victim was found his hands were tied behind his back with pieces of his T-shirt, and the cloth did not show a pattern of holes corresponding to the wounds on the back. Such evidence supports an inference that the shotgun blasts were fired after the shirt was removed. The body, moreover, was on a ledge some 15 feet below the top of the excavation, and the edge of the latter was 6 to 10 feet from the nearest point to which an automobile could be driven. From this evidence the jury could reasonably infer that before the fatal shots were fired Mitchell was forcibly removed from his car, transported to the dump, and thrown over the edge. "It is the fact, not the distance, of forcible removal which constitutes the crime of kidnaping in this state." (*People* v. *Chessman* (1951) 38 Cal.2d 166, 192 [238 P.2d 1001]; accord, *People* v. *Monk* (1961) 56 Cal.2d 288, 295 [14 Cal.Rptr. 633, 363 P.2d 865]; *People* v. *Wein* (1958) 50 Cal.2d 383, 399-400 [326 P.2d 457].) As noted at the outset, both defendants were seen to enter Mitchell's car shortly before the killing, and the car was subsequently found some two miles from the murder scene, mired and abandoned. From these facts "the jury could choose, among various reasonable inferences, the one that a purpose of the abduction was the felonious taking of the property." (*People* v. *Carter* (1961) 56 Cal.2d 549, 561 [15 Cal.Rptr. 645, 364 P.2d 477].) The foregoing evidence thus supplies the prima facie showing necessary to establish corpus delicti. (See *People* v. *Amaya* (1952) 40 Cal.2d 70, 76 [251 P.2d 324].)

The judgments are affirmed.

Traynor, C. J., McComb, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

PETERS, J.—I dissent.

The "totality of circumstances" rule in reference to the admissibility of a confession of a minor, adopted by the majority, is based on outdated concepts, disregards the recent cases in this field, and deprives the minor of the constitutional

protection to which he is entitled. The majority persist in looking upon the admission of minors' confessions entirely from the standpoint of coercion; that is, their concern is with the conduct of the police, not with the competency of the minor to waive his constitutional rights. For many years some enlightened courts and scholars have been concerned because in their opinion the coercion concept did not sufficiently protect the rights of either adults or minors. Gradually the emphasis of legal thinking has shifted from the coercion concept to that of the competency of the accused to waive his constitutional rights. The United States Supreme Court first emphasized this concept in the so-called waiver at trial cases (*Johnson* v. *Zerbst,* 304 U.S. 458, 464 [82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 146 A.L.R. 357]; *Carnley* v. *Cochran,* 369 U.S. 506 [8 L.Ed.2d 70, 82 S.Ct. 884]), and this new development reached its clearest expression in *Escobedo* v. *Illinois,* 378 U.S. 478 [12 L.Ed.2d 977, 84 S.Ct. 1758], *Miranda* v. *Arizona,* 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602, 10 A.L.R.3d 974], and related cases. In none of these cases did the court concern itself with coercion. Tested by the coercion standard both confessions were admissible. These cases held that after the required warnings are given, if the defendant demands counsel, further interrogation is prohibited until counsel is furnished—in other words, regardless of coercion, the accused is incompetent to confess until he has counsel. This new approach was extended last May to the confessions of minors in the landmark decision of *In re Gault,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428], dealing with the rights of juveniles in a juvenile court.

We are now required to apply this new approach to the confessions of minors in criminal courts insofar as waiver of their constitutional rights is concerned. It is crystal clear to me that the "totality of circumstances" rule has not afforded the protection to minors to which they are constitutionally entitled. The exhaustive collection of cases all decided under the coercion concept cited in the majority opinion is the most eloquent argument that can be made in favor of repudiating the thinking upon which those cases are based. It is my view that if minors are to be given the full advantage of modern concepts to which they are constitutionally entitled we must hold that no minor may waive his constitutional rights unless he has the advice and counsel of an adult, such as a parent, guardian or other responsible person. To state the concept more specifically—I believe that no minor may waive his constitutional right to remain silent, and his right to counsel,

unless and until he has the advice and counsel of a friendly adult.

The facts of the instant case are not in dispute. Both defendants are minors. Both have confessed to murder, implicating not only themselves, but also their fellow defendant. Defendant Lara was just over 18 when the crime was committed, and somewhat sophisticated in police station procedure. The death penalty was imposed by the jury. His conviction in large part was predicated on his confession. Defendant Alvarez was 17 years and 11 months of age, and so was given a life sentence. His conviction, too, is largely based on his confession. He, as the prosecution conceded, has an I.Q. of between 65 and 71, and a mental age of 10 years and 2 months. Both boys, after their arrests, were separately given the *Dorado* warnings (*People* v. *Dorado,* 62 Cal.2d 338 [42 Cal.Rptr. 169, 398 P.2d 361]). They both stated that they understood the warnings. They then made complete confessions. No adult was present other than the police. Had the warnings been given to an adult under similar circumstances a waiver would probably have resulted. (*People* v. *Sanchez,* 65 Cal.2d 814, 824 [56 Cal. Rptr. 648, 423 P.2d 800]; *People* v. *Thomas,* 65 Cal.2d 698, 704-705 [56 Cal.Rptr. 305, 423 P.2d 233].) The question is whether we should apply to minors the same rules that apply to adults. I think not.

Traditionally minors have been the special concern of the law. In an adult-controlled society, for their protection, minors are afforded a preferred status. This concept developed in the civil law by the holding that a minor has but a limited capacity to act. Thus he cannot make a binding contract like an adult. This rule is codified in California, the statutes providing that a minor cannot bind himself by contract (Civ. Code, §§ 33, 34, 35, 1556, 3103; Lab. Code, § 300) except for necessities, and even then only to the extent of their reasonable value (Civ. Code, § 1722).

This solicitude for minors, and the protective attitude of the law, exists in many fields besides contracts. Thus, a minor can appear in a civil court only through a guardian. (Civ. Code, § 42.) The doctrine of estoppel cannot be applied against infants. (*Lackman* v. *Wood,* 25 Cal. 147, 153; *Lee* v. *Hibernia Sav. & Loan Soc.,* 177 Cal. 656, 660 [171 P. 677]; *Morgan* v. *Morgan,* 220 Cal.App.2d 665, 675 [34 Cal.Rptr. 82].) Other civil disabilities, particularly in the field of torts, are too well known to require further elaboration.

This protective mantle has also been thrown about the

minor in the field of criminal law, but while in the civil law this protection centered upon the inability to consent, the criminal law made a different approach. From the early common law it was held that minors were the special concern of the crown, and thus developed the doctrine of *in parens patriae*. (See discussion in Note (1967) 1 San Fernando Valley L. Rev., 73, 74.) This concept has had a profound effect on the development of the criminal law insofar as it relates to minors. Based on this concept, in California, and in most other states, a complete system of courts was set up to handle most of the juvenile delinquents. (Welf. & Inst. Code, §§ 500-911.) A minor under 14 was made presumptively incapable of committing crime. (Pen. Code, § 26.) It was provided that a minor under 18 should not suffer the death penalty. (Pen. Code, § 190.1.) During confinement minor offenders are separated from adult offenders. (Pen. Code, § 273b.)

It was a natural development of the *in parens patriae* doctrine to hold, as the courts did, that a juvenile court proceeding was not aimed at punishment but was in fact not a criminal proceeding at all, and was civil in nature. This doctrine, conceived for the purpose of protecting minors, had some unexpected results. One was that, since the guarantees in the Bill of Rights are mainly aimed at protecting rights in criminal cases, minors were deprived of the protection of the Bill of Rights. Thus, as early as 1876 in California minors were denied the right of trial by jury in juvenile cases. (*Ex parte Ah Peen,* 51 Cal. 280; see for a later decision *In re Daedler,* 194 Cal. 320 [228 P. 467].) This doctrine also led naturally to the rule expressed in *In re Castro,* 243 Cal.App.2d 402 [52 Cal.Rptr. 469], that a minor was not entitled to the protection of *Escobedo* v. *Illinois, supra,* 378 U.S. 478; *People* v. *Dorado, supra,* 62 Cal.2d 338; and *Miranda* v. *Arizona, supra,* 384 U.S. 436. Thus, what started out as a doctrine for the protection of minors, became a straitjacket that made of minors second class citizens deprived of constitutional rights.

Concurrently with these developments the courts became increasingly concerned with the possibility of the abuse of the confession process, both as it affects adults and as it affects minors. Thus developed the rule that confessions were inadmissible if coerced. But some courts soon realized that the coercion rule was not a sufficient protection for minors. Thus in *Haley* v. *Ohio,* 332 U.S. 596, 599-600 [92 L.Ed. 224, 228-229, 68 S.Ct. 302], the United States Supreme Court held that, although no physical coercion had been used to secure a

confession from a 15-year-old boy who had been interrogated for 5 hours without the presence of a friendly adult, and although such a confession would have been admissible against an adult, it was not admissible against the minor. It was held that special safeguards should be thrown around confessions of minors. Long before *Escobedo, supra,* (in 1947) the Supreme Court applied to the confessions of minors the tests later adopted in that case. It was in the context of particularly protecting the rights of minors in connection with confessions that the court said: "[W]hen, as here, a mere child—an easy victim of the law—is before us, special care in scrutinizing the record must be used. . . . He cannot be judged by the more exacting standards of maturity. That which would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens. . . . [W]e cannot believe that a lad of tender years is a match for the police in such a contest. He needs counsel and support if he is not to become the victim first of fear, then of panic. He needs someone on whom to lean lest the overpowering presence of the law, as he knows it, crush him."

It was in this same context that the high court expressed its solicitude toward a 14-year-old boy who had voluntarily confessed in *Gallegos* v. *Colorado*, 370 U.S. 49, 54 [8 L.Ed.2d 325, 328-329, 82 S.Ct. 1209, 87 A.L.R.2d 614], when it stated:

"The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. . . . He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions." (See also *Reck* v. *Pate*, 367 U.S. 433 [6 L.Ed.2d 948, 81 S.Ct. 1541].)

This general concern for lack of adult guidance was recognized by the Legislature of California when it adopted section 858 of the Penal Code. It provides: "When the defendant is brought before the magistrate upon an arrest . . . the magistrate must immediately inform him . . . of his right to the aid of counsel in every stage of the proceedings. . . . [A]nd if the magistrate concludes that it is probable that the defendant is a minor . . . he shall immediately either notify the parent or guardian of the minor, by telephone, telegram, or messenger, of the arrest, or appoint counsel to represent the minor."

Chief Justice Traynor recognized the problem in his dissent in *In re Patterson,* 58 Cal.2d 848, 857 [27 Cal.Rptr. 10, 377 P.2d 74], when he stated: ''In my opinion the purpose of the Legislature in enacting section 700 [Welf. & Inst. Code] and the language it used to express that purpose require the judge at the outset of the hearing personally to find out by examining the minor and his parents or guardian, if present, whether they have been informed of the minor's right to representation by counsel and whether they wish the aid of counsel. In performing that duty the judge must also make certain that they understand the nature of the charge and its possible consequences and that if they cannot afford to employ counsel, the court can appoint counsel, if the charge is of felony proportions.''

Obviously these protections afforded minors in the courtroom would be meaningless if not extended to interrogation upon arrest. When an interrogation at the accusatory stage produces a confession, the minor has, in many cases, had his ''trial.'' As pointed out in *Dorado,* quoting from *Escobedo*: '' 'This was the ''stage when legal aid and advice'' were most critical to petitioner. *Massiah* v. *United States, supra* at p. 204 [377 U.S. 201 [12 L.Ed.2d 246, 249, 84 S.Ct. 1199)]. It was a stage surely as critical as was the arraignment in *Hamilton* v. *Alabama,* 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114], and the preliminary hearing in *White* v. *Maryland,* 373 U.S. 59 [83 S.Ct. 1050, 10 L.Ed.2d 193]. What happened at this interrogation could certainly ''affect the whole trial,'' *Hamilton* v. *Alabama, supra,* at p. 54 [7 L.Ed.2d at p. 116], since rights ''may be as irretrievably lost, if not then and there asserted, as they are when an accused represented by counsel waives a right for strategic purposes.'' ' '' (*People* v. *Dorado, supra,* 62 Cal.2d 338, 348.) Indeed, to deprive the minor at the accusatory stage of the protection considered necessary for his protection at arraignment—which is what the majority here does—is to repudiate the basic reasoning of *Dorado* and *Escobedo*. The rule I advocate assures that at no stage of the orderly administration of justice will the minor receive anything less than the full measure of protection to which he, because of his immaturity, is entitled.

The failure of the coercion concept to protect even adults from the abuse of the old confession rule was recognized in *Escobedo* and *Miranda*. Now the concepts that the accused must be informed of his constitutional rights and can waive them only by an informed consent have been added to the old

coercion concept. This new approach was extended last May to minors in a juvenile court setting in the decision of *In re Gault, supra,* 387 U.S. 1 [18 L.Ed.2d 527, 87 S.Ct. 1428]. That decision ended once and for all the holding that juvenile court proceedings resulting in confinement are civil and not criminal. It held that the Bill of Rights and the Fourteenth Amendment were applicable in juvenile proceedings. It not only restored juveniles to the status of first-class citizens, but continued to expand the concept that the juvenile must be afforded greater protection as to confessions than that given to adults. The majority opinion cavalierly dismisses the *Gault* opinion by a brief reference in a footnote. It is worthy of much more serious consideration.

That case involved the very constitutional warnings and the doctrine of waiver here involved in the context of juvenile court proceedings. The court, however, did not so limit its pronouncements. It used language sufficiently broad to indicate its concern with the whole problem of the competency of minors to waive their constitutional rights regardless of the forum adjudicating their competency to do so. In reference to the problem here involved, the court stated:

"We conclude that the Due Process Clause of the Fourteenth Amendment requires that in respect of proceedings to determine delinquency which may result in commitment to an institution in which the juvenile's freedom is curtailed, the child and his parent must be notified of the child's right to be represented by counsel retained by them, or if they are unable to afford counsel, that counsel will be appointed to represent the child." (*In re Gault, supra,* 387 U.S. 1 at p. 41 [18 L.Ed.2d at p. 554, 87 S.Ct. 1428 at p. 1451].) In reference specifically to waiver the court said (p. 55 [18 L.Ed.2d at p. 561, 87 S.Ct. at 1458]) : "We conclude that the constitutional privilege against self-incrimination is applicable in the case of juveniles as it is with respect to adults. We appreciate that special problems may arise with respect to waiver of the privilege by or on behalf of children, and that there may well be some differences in technique—but not in principle—depending upon the age of the child and the presence and competence of parents. . . . If counsel is not present for some permissible reason when an admission is obtained, the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it has not been coerced or suggested, but also that it is not the product of ignorance of rights or of adolescent fantasy, fright or de-

spair." In suggesting that the sole test is coercion the majority flies in the face of this language.

At page 49 [18 L.Ed.2d at p. 558, 87 S.Ct. at p. 1455] appears this significant language: "The authoritative 'Standards for Juvenile and Family Courts' concludes that . . . 'Before being interviewed [by the police] the child and his parents should be informed of his right to have legal counsel present and to refuse to answer questions . . . if he should so decide.'"

California has also been alert to the problem involved. In the report of the Governor's Special Study Commission on Juvenile Justice, Part II, page 14 (1960) it is stated: "[I]t cannot always be said that the minor is fully aware of what he is actually admitting to or that the parents are always cognizant of the processes that are involved. In fact, it is indeed ironic that our laws view the competency of a minor to deal with financial matters with such strictness and yet fail to make any notice of such incompetence in a matter involving the minor's basic freedoms."

The Court of Appeal in *In re Castro, supra,* 243 Cal.App.2d 402, 409, although not recognizing the significance of its language and coming to the wrong conclusion under the facts of that case, expressed the thought under consideration in the following language: "An 8-, 9-, or 10-year-old boy, or even a minor of an age up to majority, is considered by our civil law as incapable of clearly making a binding contract in the same way as an adult; in tort law there are many situations in which a juvenile is not held to the same standard of care as one who has gained his majority; the necessity of guardianship, in connection with the property rights of minors, illustrates that juveniles are not invariably held to adult standards of understanding and judgment. An unaided minor cannot convey his real property, even though he knowingly wishes to do so. How then can he be expected knowingly and effectively to waive his constitutional rights?"

In *Harling* v. *United States,* 295 F.2d 161, 163, footnote 12 [111 App.D.C. 174], the federal court stated: "Whenever possible and especially in the case of young children, no child should be interviewed except in the presence of his parents or guardian."

Thus, the pendulum has shifted. Now the law in the criminal field is approaching the capacity doctrine of the civil law.

It is a reasonable interpretation of these cases to hold that

it is the law that a minor is incompetent to waive his *Escobedo* rights unless he is afforded the counsel and advice of his parent, guardian or lawyer. He must be afforded the counsel and advice of such a friendly adult if he is to undergo police interrogation. This is also the view of legal scholars in the field (7 Santa Clara Laws. 114, 127; 40 Wash.L.Rev. 189, 200-201).

The majority opinion, in holding that each case of a minor must be decided on the "totality of circumstances" involved, disregards these modern cases, overlooks the modern thinking in this field, and relies on the coercion cases which are concerned primarily with the issue of the voluntariness of the confessions there involved. It mentions only in passing the real issue of the competency of minors to waive crucial and complex rights. The two issues, although related, are substantially dissimilar in nature.

The majority opinion tries to erect an iron curtain between consensual concepts of our civil law and "those provisions of the law governing acts of wrongdoing by a minor." It then discusses at length the voluntariness of confessions by minors and the ability of minors to withstand police coercion. As indicated, this is now a repudiated approach. It does not come to grips with the real problem involved, which is the intellectual capacity of the minor to waive or contract away his constitutional rights. Thus, the majority opinion clings fast to the old outdated authorities and refuses to recognize the impact and sophistication of the recent criminal rights decisions. It cites and relies upon some 19 cases where the sole issue discussed was coercion, and the issue of waiver and consent was not mentioned. Those cases need not be summarized here. The greater number of them arose and were decided long before the United States Supreme Court came to grips with the idea that warnings and waiver were involved and not only coercion. It is not surprising therefore that they do not contain any enlightened analysis of the question of competency to waive constitutional rights, a subject not yet fully developed by the courts. The coercion cases are simply not in point and are outdated because they are concerned primarily with the conduct of the police. Today the focus of attention has shifted from the conduct of the police to the capacity of the accused. The majority opinion simply ignores this change in focus.

Even in this era when the courts generally did not understand the relevancy of competency as distinguished from the issue of coercion, there were some enlightened judges who

were concerned with the more sophisticated problem. Some of these authorities have already been mentioned. Others could be mentioned. In *People* v. *De Flumer,* 16 N.Y.2d 20 [209 N.E.2d 93], the New York Court of Appeal was concerned with the confession of a 15-year-old boy, and his resulting plea of guilty to murder. The majority held the confession was voluntary and therefore admissible. The case is cited for this holding by the majority. But the real importance of the case appears in the language of the three-man dissent. It was there stated (p. 24) : "To subject a child in the absence of his parents or friend or counsel to questioning which might have and was intended to convict him is a violation of a basic right of individual freedom." (See also the dissenting opinion in *United States* v. *State of New Jersey,* 323 F.2d 146, 155.) These dissenting views now express the recent attitude of the Supreme Court of the United States.

The majority opinion also refers to several cases dealing with the right of a minor to waive counsel on trial in court. These cases are obviously distinguishable because at the time of waiver in court the minor under California law has the benefit and support of a friendly adult.

Two Oregon cases are cited by the majority which decide the precise point at issue adversely to the views expressed in this dissent. (*State* v. *Gullings,* 244 Ore. 173 [416 P.2d 311]; *State* v. *Casey,* 244 Ore. 168 [416 P.2d 665].) No useful purpose would be served by discussing the facts of those cases. They support the majority. They, like the majority, treat the real problem here involved in a most cursory and inadequate fashion. They, like the majority opinion, are just wrong and should not be followed. They, like the majority, reflect the thinking of an outdated era when coercion, not competency, was the main subject of concern.

The majority hold that the rule of waiver should vary with the age and maturity of each child. I think not. As was said in *Harling* v. *United States, supra,* at page 164, footnote 12: "[W]e do not believe that the question of admissibility of the child's statements as evidence against him in the District Court should vary from case to case depending on criteria which could at best only partially indicate the child's capacity to waive his rights." Moreover, the proposed rule would place on the police an almost impossible burden, requiring them, on the spur of the moment, to determine the competency and maturity of each child arrested by them.

Certainly, as a matter of federal constitutional law, minors

at some age, whether it be 21, 18 or 10, are incapable of waiving their constitutional rights to counsel and to remain silent in the absence of advice by an attorney or other adult. It is inconceivable that this court or any court would concern itself with the "totality of circumstances" when confronted with a confession and waiver of a 10-year-old who had not had the advice of an adult. But we are not here required to determine what is the particular age of *constitutional* disability because even in the absence of constitutional compulsion, we must, as a matter of California law, fix that age at 21.

The problem is a legislative one. The Legislature has repeatedly defined a minor as any person under 21. (Civ. Code, § 25; Welf. & Ins. Code, §§ 600, 601, 602; Lab. Code, § 1172; Veh. Code, § 17700.) Twenty-one is the age the Legislature has fixed for the capacity to consent to a binding contract. The analogy to waiver is obvious. When a minor is to be deemed competent for some specific purpose at a lower age, the Legislature specifically provides for it. (See 36 Ops.Cal. Atty.Gen. 85, 88.) Section 858 of the Penal Code, which deals with the same constitutional rights involved here—but at arraignment—does not make an exception to the rule that 21 is the age of majority. (See 36 Ops.Cal.Atty.Gen. 85.) As we have seen, the accusatory stage is every bit as important as arraignment, if not more so, with regard to protecting constitutional rights.

Since the Legislature has fixed 21 as the age of capacity to consent to a binding contract and as the age below which a criminal suspect needs the advice of counsel or a parent or guardian at arraignment, we have no choice but to adopt 21 as the age of capacity to consent unaided to waiver of *Dorado* rights at the accusatory stage. Until the Legislature determines otherwise, it should be held that 21 is the age below which a suspect is not legally competent to waive his rights without advice of counsel or parent or guardian.

It should be noted that when the Legislature wants to regulate the waiver of constitutional rights it knows how to express its intent. This was dramatically illustrated in the last session of the Legislature by the amendment of section 372 of the Code of Civil Procedure. That is the section that requires a guardian to be appointed for a minor, insane or incompetent person who appears as a party in a civil suit. The amendment reads as follows: "Nothing in this section or in any other provision of this code, the Probate Code, or the Civil Code is

intended by the Legislature to prohibit a minor from exercising an intelligent and knowing waiver of his constitutional rights in any proceedings under the Juvenile Court Law. . . ."

This amendment, passed after the instant case was tried, is, of course, not retroactive, and has no application to the present case. But it is significant for several reasons. In the first place, presumptively, the amendment was intended to accomplish a change in the law. It implies that before the amendment was passed a minor could not waive his constitutional rights, even in a juvenile court proceeding, so *a fortiori* he could not waive them in a superior court proceeding.

In the second place, the amendment, by limiting its application to juvenile court proceedings, and by its careful reference to certain codes and its failure to refer to the Penal Code, indicates, as clearly as if it had expressed it directly, the intent that the waiver permitted should apply only to juvenile court proceedings. This is, of course, not such a proceeding. The obvious implication is that the Legislature did not intend that a minor could waive his constitutional rights in a superior court trial.

There is still another reason why the judgments should be reversed. The jury was never instructed on the theory so eloquently and strongly argued by the majority. If it be the proper rule that in considering whether a minor has intelligently waived his constitutional rights the "totality of circumstances" must be considered, and that special rules apply and special factors must be considered in such cases, certainly the content of such rules, whether they were complied with, and what factors are involved are questions of fact for the jury. The majority emphasize time and time again that whether a waiver was made depends on the "totality of circumstances" and that that question is one "of fact." Obviously, if it is a question of fact, and it is a most important one, it should be submitted to the jury on proper instructions. Otherwise, the defendant minors have been deprived of the jury trial guaranteed to them by the Constitution.

It is true that in *People* v. *Sanchez, supra,* 65 Cal.2d 814, 827, it was held that the questions of whether the constitutional warnings were given and apparently whether they were waived were for the court and not the jury, but that case conflicts with *People* v. *Eli,* 66 Cal.2d 63, 76 [56 Cal. Rptr. 916, 424 P.2d 356], where it was apparently held that when conflicting evidence is introduced on the issues, they

must be submitted to the jury. It is not necessary to resolve this apparent conflict in this case. Here, whether required to do so or not, the issues of whether the defendants were warned of and waived their rights were submitted to the jury. But the instruction on the issue was fatally incomplete.

It must be remembered that we are dealing with minors, not adults. The majority state, in fact strongly argue, that whether the minors were warned and the warnings waived is a question governed by special rules and governed by special factors. Certainly the jury should be told what those special rules and factors are or they would not know what they were to determine. The fact defendants were minors was not even mentioned anywhere in the instructions. The jury was given but one general instruction on the issue of the warnings required, and on the issue of waiver. That instruction reads in its entirety as follows:

"You may consider a voluntary admission or confession made to a police officer only if the evidence establishes that before such interrogation:

"(1) the authorities effectively warned defendant of his absolute right to remain silent and of his right to be represented by counsel, and

"(2) defendant knowingly and intelligently waived the right to remain silent and to be represented by counsel."

Nowhere was the jury told that waiver by a minor of constitutional rights presents special problems and that special factors are to be considered. They should have been so informed. To hold that the finding of the jury is supported under such circumstances, when the jury was not told what it was to consider, was clearly erroneous. That it was prejudicial, is obvious.

The fact defendants did not request instructions on the issue is immaterial. The issue is so fundamental that the court should have given the instructions on its own motion. (*People* v. *Bevins,* 54 Cal.2d 71, 77 [4 Cal.Rptr. 504, 351 P.2d 776]; *People* v. *Eli, supra,* 66 Cal.2d 63, 76.)

For these reasons I would reverse the judgments.