[Crim. No. 2863.   Fourth Dist., Div. One.   Nov. 17, 1967.]

THE PEOPLE, Plaintiff and Respondent, v. CLARENCE HOMER HURST, Defendant and Appellant.

Claude Vibart Worrell, Sr., and Worrell & Niles for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jerold A. Prod, Deputy Attorney General, for Plaintiff and Respondent.

COUGHLIN, J.—Defendant was charged with the offenses of possession of a firearm after having been convicted of a felony, viz., a violation of Penal Code, section 12021, and possession of a tear gas cartridge, viz., a violation of Penal Code, section 12420; waived trial by jury; was found not guilty of

the former offense upon failure of proof of conviction of a prior felony; was convicted of the latter offense; and appeals.

The contentions on appeal are: (1) The court erred in admitting in evidence two tear gas cartridges which were the subject of the offense charged, because they were the product of an illegal search and seizure; (2) the court erred in admitting the testimony of an expert respecting the contents of the cartridges, because of lack of qualifications; and (3) the evidence was insufficient to sustain the conviction, because it did not establish defendant had knowledge the cartridges contained tear gas.

The two cartridges were the product of a search of defendant's home, without a warrant, when he was arrested, without a warrant, for the offense of arson. Defendant contends the search and seizure were illegal because his arrest was without probable cause, and the search was general and exploratory.

On September 10, 1964, at 5 a.m., a fire broke out in the Laguna Village Apartments at Laguna Beach. An official investigation determined it was of incendiary origin. The premises had been leased to defendant, Art Bockstahler and James Jennings who used a part thereof as a cardiac rehabilitation center. The owner of the building told officers he had seen defendant's and Jennings' automobiles in garage stalls on the premises at 1 o'clock on the morning of the fire. These automobiles were not on the premises at the time of the fire. The officers determined the fire had been started with gasoline; found two gasoline cans at the scene, one of which was filled; found a truck registered to a man named Jaeger in an open garage at the apartment complex; ascertained that Jaeger was a handyman employed by defendant, Bockstahler and Jennings; also ascertained Jaeger recently had purchased two gasoline containers like those found at the scene of the fire; and ascertained that Jaeger was admitted to a hospital on the morning of the fire suffering from burns which eventually claimed his life. While the officers were making their investigation to determine the cause of the fire defendant and Jennings appeared on the scene; offered an alibi respecting their whereabouts during the night before; stated they had been at a motel in Riverside where defendant, wearing a bright colored shirt, cashed a $100 bill. The officers checked out the alibi, but became suspicious because of its manufactured aspects in that defendant and Jennings were at the scene at 1 a.m., then went to Riverside to stay in a motel; and while at

the motel called attention to their presence by the bright colored shirt worn by defendant and by cashing a $100 bill. The police questioned Bockstahler who informed them he, defendant and Jennings had conspired to burn the building in order to collect insurance. Bockstahler was arrested. Defendant told the officers there was no insurance on the premises but a subsequent investigation revealed the existence of a fire insurance policy in a substantial amount, apparently covering equipment, in which defendant was a named beneficiary. The investigation also developed defendant previously had been involved in insurance "pay-offs" in connection with fires of an incendiary nature.

Defendant contends the evidence does not support a finding of probable cause for his arrest because the only information received by the officers respecting his participation in the arson was the statement from Bockstahler, whose reliability was untested. The premise for this contention is false. Bockstahler's statement was corroborated by many circumstances indicating defendant's involvement. Tested by the rules recently stated and applied in *People* v. *Lara,* 67 Cal.2d 365, 374 [62 Cal.Rptr. 586, 432 P.2d 202] and *People* v. *Talley,* 65 Cal.2d 830, 835 [56 Cal.Rptr. 492, 423 P.2d 564], the evidence adequately supports the finding, implied in the order of the court overruling defendant's objection, that probable cause existed for believing defendant was a participant in an arson offense.

The officers conducting the investigation were a deputy sheriff named Kelly, the county fire marshal, an investigator for the National Board of Fire Underwriters and an investigator for the district attorney's office named Banks. Bockstahler told Officer Kelly the defendant had three loaded guns and had a violent temper. Officer Kelly also learned defendant previously had been arrested on two gun charges, one of which was an assault. Defendant's record supported the conclusion expressed by Kelly that defendant should be regarded as a dangerous man. The four investigating officers and another deputy sheriff went to defendant's home to make the arrest. Defendant admitted them; answered a couple of questions; and was advised by Banks that he was under arrest for conspiracy to commit arson. Thereupon Kelly asked defendant if he had any small concealable firearms, pistols or hand guns in his possession. The latter replied: "The only guns I have are some rifles I have out in the car"; the officer responded with the statement: "Fine. We want to go ahead

and search the rest of the premises''; and defendant replied: ''Fine. Go ahead.'' Banks and defendant remained in a room on the first floor. Kelly and another officer went upstairs. While Banks was examining the contents of a foot locker, suitcase and box defendant had told him contained some of Jaeger's belongings, he noted defendant had disappeared; went upstairs when he ''heard Kelly holler''; and entered a bedroom where he saw Kelly, the defendant and some guns. While Kelly was in the bedroom defendant entered; went to a closet; reached toward a box; but was restrained by Kelly, who ordered him to face the wall. The box contained three loaded pistols. Following this incident, Banks continued his search; looked into a dresser drawer in the upstairs bedroom and saw, plainly visible, two cartridges bearing the imprint ''Tear Gas.'' They were the type of tear gas cartridges ordinarily used in a fountain pen type of projector.  ▮▮▮  Defendant's contention the search revealing the tear gas cartridges was illegal because general and exploratory is premised on the testimony of Kelly he was searching for the three weapons in question, ''general contraband, anything relating to the crime and the crime we were investigating of arson,'' and upon the claim the search incident to defendant's arrest by law was limited to obtaining evidence respecting that offense alone. It is noteworthy the tear gas cartridges were not seized by Kelly but by Banks who testified the purpose of his search culminating in the seizure was ''to locate any evidence whatsoever to connect Mr. Hurst or Mr. Jaeger to the fire that had occurred in Laguna Beach. I was looking for insurance policies, any evidence of purchase of gasoline. Anything at all.'' Concerning the search of the upstairs bedroom, Banks testified he was looking for evidence connecting defendant to the arson and he was not looking for weapons.

▮▮▮ Arresting officers lawfully may search the premises of an accused where the search is made for the purpose of obtaining and preventing destruction of evidence of the offense for which the accused has been arrested, and also for the purpose of seizing weapons that might be used to assault them. (*People* v. *Burke,* 61 Cal.2d 575, 579, 580 [39 Cal.Rptr. 531, 394 P.2d 67]; *People* v. *Cove,* 228 Cal.App.2d 466, 470 [39 Cal.Rptr. 535].) The controlling question is ''whether the search was reasonable under all the circumstances.'' (*People* v. *Webb,* 66 Cal.2d 107, 118 [56 Cal.Rptr. 902, 424 P.2d 342].) ▮▮▮ The arrest in the case at bench was not used as

a mere pretext to conduct an exploratory search. The reason and need for the search by Kelly to locate guns in defendant's possession were dictated by his information respecting defendant's prior gun charge arrests and were verified by the circumstances indicating defendant's intention to get and use the guns while the officers were at his home. Evidence disclosed by a search incident to a lawful arrest, although not evidence of the crime for which the arrest was made, may be seized. (*People* v. *Roberts,* 47 Cal.2d 374, 379 [303 P.2d 721]; *People* v. *Brooks,* 234 Cal.App.2d 662, 667 [44 Cal.Rptr. 661]; *People* v. *Dickenson,* 210 Cal.App.2d 127, 135 [26 Cal.Rptr. 601].) Seizure of the tear gas cartridges under the search in question was proper. Defendant's contention to the contrary is without merit.

Defendant's further contentions (1) the opinion of the expert witness who testified the contents of one of the cartridges was chloracetophenone, a tear gas, was inadmissible, and (2) the evidence was insufficient to show defendant had knowledge the cartridges contained tear gas, are frivolous. The expert was a criminologist duly qualified to give an opinion with respect to the chemical character of the contents of the cartridge he analyzed; the fact he had limited knowledge respecting other matters concerning tear gas is of no consequence; and the court correctly admitted the opinion in question. The cartridges were labeled ''Tear Gas'' and defendant told Banks he used the tear gas ''to shoot in the eyes of animals when he was hunting.''

The judgment is affirmed.

Brown (Gerald), P. J., and Whelan, J., concurred.